Filed 7/19/13  P. v. Strain CA4

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JEREMY DANIEL-LEE STRAIN et al.,<br><br>        Defendants and Appellants. | C062509<br><br>(Super. Ct. No. 06F04398)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH GORDON HOLLORAN,<br><br>        Defendant and Appellant. | C062652<br><br>(Super. Ct. No. 06F04398) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT ANTHONY NELSON,<br><br>        Defendant and Appellant. | 3 Crim. C062742<br><br>(Super. Ct. No. 06F04398) |

THE COURT:

It is ordered that the opinion filed herein on June 26, 2013, be modified as follows:

1.      On page 29 of the opinion, at the end of the first full sentence, ending on line four, add a footnote following footnote 23, to read as follows:

In a petition for rehearing, defendant Holloran argues we are not allowed to consider the circumstance that the evidence was elicited by Holloran's own trial counsel unless we invite supplemental briefing, because Government Code section 68081 precludes us from deciding an appeal based on an issue not proposed or briefed by the parties. However, the circumstance that the challenged evidence was elicited by Holloran's counsel is not a new "issue" under Government Code section 68081. The legislative history of that statute indicates the court may apply rules, principles, or theories of law to the issues raised by the parties without affording supplemental briefing. The language of the statute was amended before enactment to substitute the words "an issue" for the phrase "a rule, principle, or theory of law." (See Assem. Amend. to Sen. Bill No. 2321 (1985-1986 Reg. Sess.) July 9, 1986; Gov. Code, § 68081 (added by Stats. 1986, ch. 1098, § 1.) Doubtless this change reflects a desire to avoid an endless cycle of mandatory rebriefings and rehearings that could be broken only by the court parroting the brief of one of the litigants. Moreover, "[s]ection 68081 does not require that a party actually have briefed an issue; it requires only that the party had the opportunity to do so. . . . [The rule of court requiring the parties to file appellate briefs] give[s] the parties the opportunity to brief any issues that are fairly included within the issues actually raised." (*People v. Alice* (2007) 41 Cal.4th 668, 677.) Here, the "issue" raised by defendant was the admissibility of statements made by Nelson to Linggi. Defendant had the opportunity to brief the issue and he did, but his arguments on appeal were based on his own erroneous recitation of the facts. It was not the prosecutor who elicited the evidence about

2

which he complains. Defendant brought out the evidence. We find nothing in Government Code section 68081 that mandates an appellate court to extend to a defendant an opportunity for a do-over when the defendant makes a legal argument on an issue grounded on an erroneous understanding of the procedural facts underlying the issue.

2. On lines 11-12 on page 52 of the opinion, replace the parenthetical "(See fn. 28, *ante*.)" with "(See fn. 29, *ante*.)"

3. On line 2 on page 73 of the opinion, after the sentence reading: "Those cases are inapposite here." add a footnote following footnote 34 in the opinion as filed June 26, 2013, to read as follows:

In his petition for rehearing, defendant Holloran claims that we misstate the record by saying the trial judge made no finding regarding his father's credibility. Holloran cites the judge's response when Nelson's lawyer conceded that Juror No. 10 should be removed from Nelson's jury for questionable veracity after the juror claimed not to recall having spoken with Holloran's father, yet Holloran's father knew personal information about the juror that turned out to be true, i.e., that the juror worked in a bakery, got off work at 1:00 p.m., and ate a snack to stay attentive. The judge said to Nelson's trial counsel, "I agree. I share your concerns as to [the juror's] veracity." At most, this comment reflects that the judge believed that Holloran's father indeed spoke with this juror, as stated by Holloran's father. In contrast, our opinion rejects Holloran's argument that the trial court found the father's *description of his encounters* with the juror to be credible. Holloran cites no evidence of any such finding. Our review of the record reflects that the trial court did not make a finding that the father was credible in all particulars.

4. In the second sentence of the third full paragraph on page 87 of the opinion, replace the parenthetical "(fn. 37, *ante*)" with "(fn. 39, *ante*.)"

3

5.        The two new footnotes added above will require renumbering of all footnotes following footnote 23.  Modification Nos. 2 and 4 are made to reflect the footnote references in the body of the opinion, which have been necessitated by the footnotes added here.

There is no change in the judgment.

Defendant Holloran's petition for rehearing is denied.

FOR THE COURT:


            ROBIE            , Acting P. J.


            BUTZ            , J.


            MURRAY            , J.

Filed 6/26/13  P. v. Strain CA3 (unmodified version )

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEREMY DANIEL-LEE STRAIN et al.,<br><br>Defendants and Appellants. | C062509<br><br>(Super. Ct. No. 06F04398) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH GORDON HOLLORAN,<br><br>Defendant and Appellant. | C062652<br><br>(Super. Ct. No. 06F04398) |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANTHONY NELSON,<br><br>Defendant and Appellant. | 3 Crim. C062742<br><br>(Super. Ct. No. 06F04398) |

1

Defendants accosted several people at a public park, leaving a park worker paralyzed and another victim with a stab wound, concussion and broken jaw. Defendants Jeremy Daniel-Lee Strain, Joseph Gordon Holloran, and Robert Anthony Nelson were convicted of aggravated mayhem (Pen. Code, § 205[1] (count two)) and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1) (count three)). Defendant Alexander Schornberg Kent was convicted of simple mayhem (§ 203 (lesser included count two)) and assault with force likely to produce great bodily injury (§ 245, subd. (a)(1) (count three)). Holloran and Nelson were also convicted of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1) (count four)) and battery with serious bodily injury (§ 243, subd. (d) (count five). An enhancement for personal infliction of great bodily injury causing coma or paralysis under section 12022.7, subdivision (b) was found true as to each defendant except Kent. A separate enhancement for personal infliction of great bodily injury under section 12022.7, subdivision (a) was found true as to Holloran and Nelson. A gang enhancement (§ 186.22, subd. (b)(1)) was found true as to Nelson, who was tried by a separate jury in the same trial. All defendants were acquitted of attempted murder (§§ 664, 187 (count one)) and the lesser included offense of attempted voluntary manslaughter (§§ 664, 192).

Defendants Strain, Holloran, and Kent, who were all tried by the same jury, raise a variety of contentions in consolidated appeals (C062509 & C062652). Nelson claims insufficiency of the evidence as to the gang allegation in a separate appeal (C062742) we ordered consolidated for purposes of oral argument and disposition only.

---

[1] Undesignated statutory references are to the Penal Code.

We vacate the restitution orders and remand for a restitution hearing related to one of the victims for Holloran, Kent, and Strain. We also make various other orders related to victim restitution. We otherwise affirm all four judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

An amended information filed on April 8, 2009, charged all four defendants with the following:

Count one - Attempted murder of Richard Dickerson (§§ 664, 187),

Count two - Aggravated mayhem on Richard Dickerson (§ 205),

Count three - Assault by means of force likely to produce great bodily injury (GBI) on Richard Dickerson (§ 245, subd. (a)(1)),

Count four - Assault by means of force likely to produce GBI or with a deadly weapon, a knife, on Jeffrey Dobbs (§ 245, subd. (a)(1)), and

Count five - battery resulting in infliction of serious bodily injury on Jeffrey Dobbs (§ 243, subd. (d)).

As to counts one and three, it was alleged that defendants personally inflicted GBI causing paralysis and a coma to Richard Dickerson. (§ 12022.7, subd. (b).) As to counts four and five, it was alleged that defendants personally inflicted GBI to Jeffrey Dobbs. (§12022.7, subd. (a).) As to all counts, it was alleged that defendants committed the offenses for the benefit of, at the direction of and in association with the Norteño criminal street gang. (§ 186.22, subd. (b)(1).)

### Dual Juries

The parties agreed to dual juries. A separate jury was impaneled for Nelson, so that the jurors in his case would not hear evidence of a videotaped conversation between the other three defendants at the sheriff's station in Nelson's absence.

3

## Prosecution Case

On May 11, 2006, defendants got drunk and made trouble for various people at Hagan Park in Rancho Cordova. That evening, they attacked and seriously injured the victims, Richard Dickerson and Jeffrey Dobbs. The eyewitness testimony conflicted as to exactly who did what.

Dickerson, a park worker, was unable to provide details at trial because the attack left him with memory loss.

Dickerson's companions, his friend Jeffrey Dobbs and his cousin Daniel Riddle, had volunteered to help Dickerson set up a stage. As they were preparing to leave the park, they heard a woman, later identified as Betty Williams, calling for help, asking that someone call 911. Williams and a male holding a 12-pack of beer -- whom Dobbs and Riddle identified as Kent -- yelled profanities at each other. According to Dobbs, Kent had approached behind Williams and was yelling at her in a threatening manner. Dobbs told a sheriff's deputy that the person he later identified as Kent called Williams a bitch and told her, "I'm a Norteño." Riddle testified that Kent said he was "East Side Piru" and she was "fucking with the wrong people." Dickerson and his companions approached the group to calm the situation.

A passerby who looked like a drug addict approached. All witnesses and the parties referred to this person as "Tweaker."[2] Kent asked Tweaker, "what the fuck are you looking at" and faked as if he were going to throw a can of beer at Tweaker. Tweaker took out a knife and threatened to take Kent's life.

Kent made a noise "kinda" like a yell, and four to five males, mostly White, came running down the hill to his aid. There was a physical "tussle" between Kent and Tweaker. By that point, the group running down the hill was about 20 feet away. Dobbs

---

[2] This person was never identified. We will refer to him as "Tweaker," as did the witnesses.

4

and Dickerson were on their phones trying to get through to 911. Dobbs told the group that they were "on 911" and suggested that everybody go their separate ways. Dickerson said, "Hey, I work here. You guys got to go." Dobbs testified that Kent threw a beer can at Dickerson which struck Dickerson and knocked him to the ground.[3] Tweaker was also hit with a thrown beer can, and ran away toward the parking lot. Dobbs said two of the males chased after Tweaker. Dobbs said three or four males kicked and stomped Dickerson's head and body as he lay on the ground with his knees pulled up in a defensive position. Dobbs initially identified Kent as one of the people who had kicked Dickerson. He said he last saw Kent when Tweaker ran, but was not sure whether Kent ran after Tweaker. Dobbs later testified Kent was in the group around Dickerson when Dickerson was being kicked, but he could not be sure Kent did any stomping or kicking. Riddle, who was already backing away, and Williams ran to Dickerson's nearby truck. Riddle said the males in Kent's group surrounded Dickerson and Dobbs. Riddle identified Kent as one of the people who was kicking Dickerson.

Dobbs was attacked by three people. During this assault, he was punched in his jaw and ribs, stabbed in the side, and then hit on the back of the head as he fled toward Dickerson's truck.

Dobbs fell several times while he was attacked. After the fourth time he fell, all of his assailants stopped their assault on him and went toward Dickerson. When Dobbs got to Dickerson's truck, he looked back. He thought there were five to six people kicking and stomping Dickerson at that time.

Sometime during the mêlée and after Dickerson was hit with a can of beer, Dobbs heard a male voice refer to the Norteños gang. He also heard a male voice say, "[i]t's a

---

[3] Dobbs had previously told police that the subjects who attacked Dickerson knocked him to the ground.

Rancho thing" and "You fucked with the wrong people." He did not know who said those things.

At trial, Dobbs was unable to identify his attackers. He had told a sheriff's deputy and testified at the preliminary hearing that a shorter, Mexican guy flanked him and stabbed him in the side with a knife, but he was not sure at trial. Nelson is Puerto Rican, and the only Hispanic male in the group.

A truck from the adjacent parking lot, which may have been driven by Tweaker, drove toward the group and hit Holloran. Dobbs testified the truck drove "right into the crowd" that was kicking and stomping Dickerson, and the person that was hit was on the asphalt "[a]bout ten feet" from Dickerson. Dobbs testified that at the moment of the collision, the person who was hit was in the general area of Dickerson, but was not kicking or stomping him at that time. Dobbs testified he could not tell whether that person had kicked or stomped Dickserson. Defendants collected Holloran and fled.

Dickerson suffered major trauma, with injuries to his head, including fractured facial bones, and a single injury to his wrist, which could have been a defensive wound. He was in a coma for three months. He testified from a wheelchair and was still unable to walk. At the time of trial, he was living in a facility for people with traumatic brain injury.

Dobbs suffered a stab wound to his right lateral chest, a jaw fracture, and a concussion. He had surgery, during which his jaw was wired shut and a metal plate with screws was inserted into his jaw.

Betty Williams testified that shortly before the attack, she and her then-boyfriend, Norman Thompson, encountered a group of people in the park -- two females who appeared Mexican, several males who appeared White, and one male who looked of "mixed" race and had "brownish-green" eyes, later identified as Nelson.

One male was called Joe (Holloran's first name) by the others. The mixed-race male asked for a cigarette in a "stronger than polite" voice, and Thompson gave him one.

6

Then the mixed-race male asked Thompson where he was from. Thompson said, "San Francisco." Williams testified that the mixed-race male looked Thompson up and down, angrily hunched his shoulders up and forward and said he was from "Piru." After reviewing the statement she had made to sheriff's deputies, Williams testified that she thought it may have been the guy who had been called Joe who made these statements. In response to the statement about being from Piru, Thompson said, "Well, this is the Bay." Williams and Thompson ran away in different directions, with some of the group following Thompson, and others following Williams. She thought the men who chased Thompson were "Joe" and the mixed-race male. As she fled, Williams screamed "somebody call the police." Williams testified the park worker tried to help but ended up on the ground with several men punching and kicking him. She saw the two males who had chased Thompson swing at another person who had tried to help her and then join the other three males in attacking the park worker who was on the ground.

Jeffrey Brown encountered defendants earlier that day. He was sitting in the park with friends Debi Ravareau and Angela Freitag and their children. A group of about eight males and two females, some White and some Hispanic, walked by, followed by two intoxicated White males drinking from a vodka bottle, "cussing" loudly and making vulgar comments. Brown asked the two to watch their language because "two ladies [were] sitting there." In response, one of the two put his fists up and the other punched Brown on the chin.[4] Brown wisely disengaged and kept his distance but kept an eye on

---

[4] At trial, Brown was not sure, but he thought it was Holloran who punched him, and that the other person who was present at that time was Kent. He had previously identified a photograph of Strain as the person who punched him when shown a photo lineup by a sheriff's investigator. Ravareau testified that the person who punched Brown was Strain. According to Ravareau, after Brown was struck, Kent laughed and said, "we own you" and "you need to go sit down." Strain testified he was the one who struck Brown and thereafter told Brown to "go off with his bitches" as he and Kent walked away.

the troublemakers.  Brown later saw them as part of a "swarm of guys" in the parking area, kicking and punching a person who was on the ground.

Ravareau saw a Hispanic male, Holloran, and another White male run toward the park worker (Dickerson).  Each man, one after the other, hit Dickerson in the upper body.  She could not tell whether they hit Dickerson in the chest, face or head.  Dickerson dropped to the ground after the third man punched him.

The three men, including Holloran, then went to a person Ravareau learned later had been stabbed (Dobbs).  She saw a "scuffle" with the three men moving their arms and hands.  They appeared to assault Dobbs together.  Although her recollection was hazy, she acknowledged having testified at the preliminary hearing that she saw one of the three hit the stabbing victim in the side.  She turned and noticed Kent, Strain, and a third White male run toward Dickerson and kick and stomp him as he lay on the ground.  She saw a vehicle strike Holloran.

Angela Freitag testified at the preliminary hearing that she thought the person who got hit by a vehicle (Holloran) was part of the group "stomping" on Dickerson.

After Holloran was hit by the vehicle, the other defendants loaded him into Kent's red Bronco and brought him to the nearby Holloran home.  A neighbor heard something hit the ground as the Bronco went by, and picked it up.  The object was a wallet.  It contained some of Dickerson's identification, but there was no money in it.

At the Holloran home, Nelson told Holloran's father, Timothy Holloran, "Dude ran over Joe."  The father told a sheriff's deputy that Nelson said they stopped the driver, and took his driver's license from him, which Nelson handed to the father.

Holloran's married sister, Sarah Holloran Linggi, testified that Kent and Strain came to her apartment that night and said her brother had been hit by a truck.  Kent was not wearing a shirt and he had dried blood smeared on his chest.  Strain lived in an apartment that was directly upstairs from Linggi's apartment.

8

Nelson telephoned Linggi later and asked if her brother was okay. According to Linggi, Nelson said he loved her brother like family and he "would kill somebody" for him. Nelson said he hit somebody in the head with a bat at the park that day and stabbed someone.[5] On direct examination, Linggi testified that Nelson did not say whether the person he stabbed and the person he hit with the bat were the same person; nor did he say why he stabbed and hit somebody with a bat. She also said he did not say how many times he stabbed someone, but said he hit the person with the bat four or five times in the head. She told him to "shut up" because she did not want him to get in trouble. A few weeks later, Linggi reported Nelson's admissions to the sheriff's investigators because she wanted to get it off her chest and "[t]here were boys that were gonna go to prison for something they didn't do." On cross-examination by counsel for Holloran, Linggi testified that Nelson said he stabbed the person because that person was on top of Holloran.

Strain's wife Kimberly (who married him after this incident) testified that Strain went out that day with Holloran and Kent in Kent's red and white Bronco. They came back to the apartment in the afternoon and picked up a friend, Jason "Bubba" Anderson. Strain, Kent, and Anderson returned as it was getting dark outside. They said Holloran got hit by a car. Kent had no shirt and was not wearing shoes when he arrived. Strain had "kind of a lot of blood" on his pants. Kent and Anderson said they "had that nigga choking on his own blood" and thought they killed him.[6]

---

[5] None of the eyewitnesses mentioned a bat, although one was found behind the driver's seat in Kent's vehicle.

[6] This evidence came in against Kent only. Anderson was not charged or called as a witness. Kent asserts he "impeached" Kimberly's testimony about what he said by eliciting that she did not disclose it until a few months before trial.

A helicopter appeared overhead and sheriff's deputies soon arrived at the apartment. Kent and Anderson went inside. Strain started to go inside, but then turned around and walked toward the deputies. After going inside, Anderson, who was staying at the apartment, supplied Kent with some clothes. They both cleaned up and changed clothes. Kent made phone calls in an attempt to get a ride away from there. Strain's wife allowed the deputies to enter the apartment, where they arrested Kent and Anderson. Both were in her bedroom where the children were sleeping.

The deputy who entered testified that he announced "Sheriff's Department" three to five times. He found Kent and Anderson in the bedroom, pretending to be asleep.

Kent, who had been arrested and was seated in the patrol car, yelled repeatedly "[s]top snitching" to Anderson, who was talking to the sheriff's deputies.[7] Kent's words were captured by a tape recorder in the patrol car. Among the things he said while in the car was "I didn't stick nobody." No deputies had said anything to him about anybody being stabbed.

A deputy sheriff took a statement from Holloran at the hospital.[8] Holloran said he had pain in his back and "tailbone." Nevertheless, he was coherent and able to answer questions. Holloran said he went to Hagan Park alone, met some acquaintances, heard a commotion, which did not involve his acquaintances, was intentionally hit as he left the park by someone driving a truck, and got a ride home from someone he knew as "Dom." Holloran said he was "an associate of the Norteños" gang and told the deputy he had had a confrontation with "some Sureño gang members" two weeks earlier.

---

[7] The trial court instructed the jury that it could consider this evidence against Kent only and not against any other defendant.

[8] The trial court instructed the jury that this statement could be used against Holloran only.

At the sheriff's station, deputies placed Holloran, who had been released from the hospital, Kent and Strain in an interview room and secretly videotaped their conversation. The video recording was played for the Holloran/Kent/Strain jury but not for Nelson's jury.

At various points, the following was said:

Kent said, "Bubba[ Anderson's] snitchin." Strain said, "Telling them everything," and Kent said, "Singing like a canary." Later, Kent said the people in the park snitched.

At another point, Holloran and Strain said they thought Nelson stabbed a person. Later, Strain said, "I think Robby [Nelson] stabbed him," and Holloran said, "Yeah, I'm pretty sure, but that's Rob for you." At another point, Strain said, "We had it taken care of. Why did he have to stab him?" Holloran said, "That's how Rob is. I mean, it would not surprise me at all."

At one point Strain reenacted stomping on somebody. At another point, Kent looked at Strain's shoes and said, "Your K-Swiss are so bloody." Strain replied, "If they were white, nigga, they'd be red" and "I put bodies on these."

Kent said he should have run when the police came to Strain's house. Holloran said his dad should never have called 911.

The three discussed jumping bail. Kent said he intended to call Aladdin and Strain responded, "That bail bondsman won't never see me again." Holloran also said Aladdin would never see him again. Holloran said he intended to flee to Canada and was never coming back. Kent said he would go to Minnesota and live with his uncle.

As we discuss *post*, Kent and Strain testified at trial and tried to explain away the conversation. We will also discuss Holloran's admission that he kicked the victim before he was struck by the vehicle.

## Defense Case

Holloran and Nelson did not testify at trial, but Kent and Strain did.

11

Kent testified he did nothing wrong. He only threw a beer at Tweaker in self-defense. He claimed that the witnesses who saw him kick or stomp Dickerson were inaccurate. He denied ever touching Dickerson. He claimed the only time he was close to Dickerson was when he picked up Holloran. Kent also denied throwing beers at Dickerson.

Kent testified that he, Holloran, Strain, Nelson, and Anderson drank alcohol that day. Kent was drunk, but his intoxication did not make him madder than he would have been if he had been sober; it made him less scared. Strain, who was "sloppy" drunk, punched Brown. Kent saw Strain in an angry verbal exchange with Thompson and Williams. Strain, Holloran, and Nelson chased after Thompson. Kent headed for the parking lot, where he came upon Williams pointing at him and yelling for help. Angry at being falsely accused, Kent yelled back. Tweaker approached in a threatening manner. Kent was scared. With a beer can in his hand, Kent hit Tweaker. Dobbs, who was 20 to 25 feet away from Kent, made a movement that Kent interpreted as pulling a knife. Tweaker ran away, and Kent ran after him. When asked at trial why he chased someone he supposedly feared, Kent said he did not know. When pressed, Kent said when Tweaker ran, "it kind of made [him] not scared." Kent claimed he did not hear Tweaker say, "I'll take your life." He also said he never saw a knife in Tweaker's hands. Kent saw Tweaker jump into a vehicle. Kent ran to his red Bronco. From his position in the parking lot, Kent saw Strain grappling with Dickerson. They were both on their feet and each had their arms around the other's upper body. Kent then saw Holloran step into the road, heard the engine "rev" in the truck in which he had last seen Tweaker, and then saw the truck drive directly toward Holloran and strike him. Holloran landed where the grass met the pavement, about six to eight feet from Dickerson who, by this time, lay unconscious on the grass. Kent helped Holloran to the Bronco. Nelson straddled Dickerson and went through his pockets. Nelson kicked Dickerson once in

12

the head and then joined his friends in the Bronco.  Kent agreed that the male described by witnesses as mixed race with hazel eyes was Nelson.

Kent testified that he had on red basketball shorts because he was given them by the school and red is one of the school's colors.  Contrary to Williams's testimony, Kent denied ever saying he was an East Side Piru.  He testified he yelled to Anderson not to talk to the police only because the police had nothing on them, and they did not do anything.

Regarding the recorded conversation at the sheriff's station, Kent testified he said Anderson was "singing like a canary" because, even though Kent himself was innocent, he "assumed" his friends were not.  During the recorded conversation, Kent observed Strain's shoes were bloody.  Kent testified that Strain said he "put bodies on these."  Kent also testified that Holloran and Strain said they kicked somebody and that what they said was on the video recording of their conversation:

"[PROSECUTOR]:  And they [Holloran and Strain] never told you they kicked anybody?

"[KENT]:  Yes, they did.

"[PROSECUTOR]:  Who told you they kicked?

"[KENT]:  It was on the interrogation video.

"[PROSECUTOR]:  Right.  [¶]  Mr. Strain reenacts the kicking, right?

"[KENT]:  Yes.

"[PROSECUTOR]:  And Mr. Holloran says something, 'I was kicking him, bang, bang, bang, and then I got hit by the car.  Pow,' right?

"[KENT]:  Yes."

On cross-examination by Holloran's counsel, Kent said he did not have an independent recollection of Holloran's words but heard them on the recording and believed the transcript matched what he heard on the recording.

13

Strain testified he was drunk that day.  He punched Brown but did not kick or injure Dickerson or Dobbs and did not chase Williams.  Holloran and Anderson got into an argument with Williams and Thompson.  Thompson became aggressive, saying he would "fuck anybody up that wants it."  Strain took the comment from Thompson (who was five feet two inches tall) as a threat, and he and Holloran walked toward Thompson and chased him when he ran.  Strain testified he did not know why he ran after Thompson.  Holloran fell behind and disappeared.  Strain gave up the chase and walked toward the parking area.  Anderson ran up to him and told him there was a big fight in the parking lot and someone was hurt.  Strain then ran toward the parking lot and saw Dickerson on the ground.  A truck brushed by Strain, causing him to stumble and fall over the bloodied Dickerson, but he testified he had no idea how he got blood on his shoes.

Strain claimed he was being sarcastic during the conversation at the sheriff's station when he told his friends he had "put bodies" on his shoes.  He said he could not explain why he said "[w]e had it taken care of," although he was referring to the people with whom he had been.  As for the stomping reenactment, Strain claimed he was mimicking what Anderson had done, even though he never said anything about Anderson at the time he demonstrated the stomping movements.

Strain agreed that the male described by witnesses as mixed-race with hazel eyes was Nelson.

### Verdicts and Sentencing[9]

The jury found Strain guilty on counts two and three -- aggravated mayhem and assault with force likely to produce GBI on Dickerson, but not guilty on the other counts or as to attempted voluntary manslaughter, a lesser included offense to attempted murder

---

[9] We set forth the victim restitution orders, *post*.

14

charged in count one. The jury found true the allegations that Strain personally inflicted GBI and caused paralysis or coma due to brain injury. The jury found the gang allegation on counts two and three not true.

The trial court sentenced Strain to an indeterminate term of seven years to life on count two and imposed but stayed pursuant to section 654 a determinate term of eight years for count three and its enhancement.

The jury found Holloran guilty on counts two and three -- aggravated mayhem and assault by means of force likely to produce GBI on Dickerson. The jury also found him guilty of counts four and five, assault with a deadly weapon and battery with serious bodily injury on Dobbs. The jury found true the allegations that Holloran personally inflicted GBI and caused paralysis or coma due to brain injury as to Dickerson, and personally inflicted GBI as to Dobbs. The gang allegation was found not true. And the jury found Holloran not guilty of count one, attempted murder and the lesser included offense of attempted voluntary manslaughter.

The trial court, after denying Holloran's motion for new trial for insufficiency of evidence, sentenced Holloran to an indeterminate term of seven years to life on count two, aggravated mayhem on Dickerson, plus a consecutive determinate term of six years on count four, assault with a deadly weapon on Dobbs and the GBI enhancement. Pursuant to section 654, the court imposed but stayed three years for the assault by means of force likely to produce GBI on Dickerson charged in count three and three years for battery with serious bodily injury on Dobbs charged in count five.

The jury found Kent guilty of simple mayhem as a lesser included offense to aggravated mayhem on Dickerson charged in count two and assault by means of force likely to produce GBI on Dickerson charged in count three. The jury found the GBI allegations concerning both victims and the gang allegation not true as to Kent. The jury also found Kent not guilty on count one, attempted murder, as well as the lesser included offense of attempted voluntary manslaughter, and count three, aggravated mayhem on

15

Dickerson, as well as counts four and five, assault with a deadly weapon, the lesser included offense of misdemeanor assault, and battery with serious bodily injury on Dobbs.

The trial court sentenced Kent to a determinate upper term of eight years for mayhem on Dickerson. Pursuant to section 654, the court imposed but stayed three years for assault by means of force likely to produce GBI on Dickerson.

Nelson's separate jury found him guilty on counts two and three, aggravated mayhem and assault by means of force likely to produce GBI as to Dickerson, and counts four and five, assault with a deadly weapon and battery with serious bodily injury as to Dobbs. Nelson's jury found true the gang allegation and the allegations that Nelson personally inflicted GBI and caused paralysis or coma due to brain injury as to Dickerson and GBI as to Dobbs.

The trial court denied Nelson's motion for new trial and sentenced him to an indeterminate term of 15 years to life on count two, aggravated mayhem, and the gang enhancement, and a consecutive determinate term of 16 years, consisting of the midterm of three years on count four, assault with a deadly weapon on Dobbs, plus three years for the GBI enhancement as to Dobbs, plus 10 years for the gang enhancement. The court imposed but stayed pursuant to section 654 three years on count three, assault by means of force likely to produce GBI and five years for the GBI enhancement as to Dickerson, as well as three years on count five, battery with serious bodily injury on Dobbs, and a three-year gang enhancement.

## DISCUSSION

### I. The Appeals of Strain, Holloran, and Kent

We refer to the arguments by the defendant who bears the laboring oar in the appellate briefs, but we have in mind that each defendant joins in any helpful contentions of the others.

16

## A. Holloran's Motion to Set Aside Charges

Holloran contends his convictions must be reversed because the trial court improperly denied a section 995[10] motion to set aside charges and allowed him to be charged with attempted murder and personal use of a knife, after a magistrate supposedly concluded he did neither of these things, yet held him to answer. Although the jury found Holloran not guilty of attempted murder and no personal use of a knife allegation was advanced by the prosecution, he argues he was prejudiced by the anxiety and embarrassment of defending himself against those accusations and, without those charges, he may have obtained a more favorable outcome on the other charges. We find no error.

### 1. Background

At the conclusion of the preliminary hearing, the magistrate said, "we've got some differing versions on how many people were involved in the beatings and so forth, different numbers at different times. But I think overall given when you take the record as a whole, it's clear all these defendants were there, I think they all took part in the beating. [¶] [T]here's enough for at least a holding order, to find that they all took part in the stomping of Mr. Dickerson."

When asked to clarify that there was sufficient evidence of express malice for the attempted murder charge, the magistrate initially said, "No, I don't think so. No. I think there's enough for implied malice, and that's what I'm finding." The defense noted implied malice would not support the attempted murder charge.[11] The prosecution

---

[10] Section 995, subdivision (a)(2), says an information shall be set aside upon a defense motion if "the defendant had not been legally committed by a magistrate" before the filing of the information, or "the defendant had been committed without reasonable or probable cause."

[11] See *People v. Stone* (2009) 46 Cal.4th 131, 139 (implied malice suffices for murder but not for attempted murder).

argued the stomping of Dickerson's head as he lay motionless on the ground showed express malice. The magistrate said, ". . . Upon reconsidering, . . . I'm going to make a finding that there is enough for purposes of the preliminary hearing to hold them on an express malice finding. So I'm going to reconsider and amend my finding of fact regarding that particular point."

As to the personal use of a knife, the magistrate wrote on the complaint, "Nelson only" and placed parentheses around the words, "with a deadly weapon, to wit, a knife, and . . . ." As to that, the magistrate said, "With regard to Count Four, that was the personal use of a knife. Now I'm holding them all to answer on that 245 with GBI. I'm holding them all to answer to that. But the *personal use of a knife enhancement* should only apply then to Mr. Nelson. That's the only one." (Italics added.)

Strain filed the section 995 motion to dismiss the case, claiming insufficient evidence had been presented at the preliminary hearing. Holloran joined in the motion. The trial court -- after reviewing the 1653-page preliminary hearing transcript -- denied the motion, finding the charges were supported by the evidence adduced at the preliminary hearing.

### 2. Analysis

Our standard of review of section 995 rulings is to determine whether substantial evidence supports the decision of the magistrate holding the defendant to answer the charges. (*People v. Davis* (2010) 184 Cal.App.4th 305, 310-311.) A defendant must show not only that denial of the motion was erroneous, but also prejudicial. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 140 (*Letner & Tobin*).)

Holloran cites the rule that an information cannot include charges for which a magistrate found insufficient evidence. (*People v. Slaughter* (1984) 35 Cal.3d 629, 652, fn. 18.) Holloran claims (1) the magistrate found insufficient evidence of the express malice required for attempted murder, at least as to defendants who did not personally stomp on Dickerson, and (2) Holloran did not stomp Dickerson because Ravareau

18

testified Holloran got hit by the truck while others were kicking Dickerson.[12] We will assume this theory is preserved for appeal despite Holloran's admission that no one presented it to the trial court.

Contrary to Holloran's assertion, the magistrate did not find that personal stomping was required for express malice or that Holloran did not stomp Dickerson. Rather, the magistrate's initial finding of implied malice was based on the "record as a whole" showing probable cause that "all [defendants] took part in the stomping of Mr. Dickerson." Upon reconsideration, the magistrate found these same facts supported express malice. Holloran fails to show grounds for reversal in the magistrate's reconsideration of the matter.

Holloran relies on *Letner & Tobin*, contending that our high court implied in that case that a defendant is prejudiced and entitled to relief if (1) a magistrate makes a factual finding that should preclude trial on a given count, (2) the prosecutor nevertheless files the count, and (3) the jury finds the defendant not guilty of that count. We discern no such implication in that case. Our high court simply held that a *defendant is required to show prejudice* when a prosecutor files a charge for which the defendant is not held to answer, a section 995 motion is denied, and defendant is convicted after trial. (*Letner & Tobin*, *supra*, 50 Cal.4th at p. 140.) Even so, we are not presented with the same scenario here. Unlike in *Letner & Tobin*, where the defendants were not held to answer on the charge they sought to have dismissed, Holloran was held to answer on the attempted murder charge.

---

[12] The same witness testified at trial that Holloran punched Dickerson, but she did not see Holloran kick or stomp Dickerson. Or at least Holloran did not do so while he was walking across the grass, which was "pretty close to [where] the park worker was being kicked on the ground or towards the tail end of that."

Holloran also contends the magistrate did not find that he personally used a knife and adds that he was improperly held to answer on count four, the assault on Dobbs with a deadly weapon. He bases his contention on the magistrate's notation, "Nelson only" on the complaint and parentheses around the words, "with a deadly weapon, to wit, a knife, and . . . ."

The amended information charged all defendants in count four with a section 245 "assault upon JEFFREY DOBBS, with a deadly weapon, to wit, a knife, and by means of force likely to produce great bodily injury." As to this count, the pleading also contained the following notice: ". . . This offense is a serious felony within the meaning of . . . section 1192.7(c)(23)[13] in that the defendants personally used a dangerous and deadly weapon" and further alleged that each defendant personally inflicted GBI.

The charges and allegations in the pleading were not inconsistent with the magistrate's finding that Holloran did not personally use the knife. Count four alleged assault with a deadly weapon and by means of force likely to produce GBI on Dobbs. As noted, the magistrate expressly held defendants to answer on the "245 with GBI." There was sufficient evidence at the preliminary hearing to establish Holloran's liability as an aider and abettor under both theories. At trial, the prosecutor proceeded only on the deadly weapon theory, and he argued that Holloran was liable as an aider and abettor to Nelson, who personally used the knife. The jury in the verdict form found Holloran guilty of assault with a deadly weapon. And the jury found Holloran personally inflicted GBI under section 12022.7, subdivision (a) for his involvement in physically assaulting

---

**13** A similar section 1192.7 notice was appended to each count. Section 1192.7, subdivision (c)(23), defines "serious felony" to include "any felony in which the defendant personally used a dangerous or deadly weapon." This language has no penal consequences in the current case. The only purpose is to establish the offense as a serious felony offense for purposes of qualifying the conviction as a strike offense in future felony prosecutions. Since there was no finding in this case that Holloran personally used a weapon, the language is ineffectual for that purpose as to Holloran.

20

Dobbs and Dobbs's resulting broken jaw, which was inflicted during the commission of the assault with a deadly weapon.[14]

We conclude that the magistrate's finding concerning personal use of the knife as reflected by the written note on the complaint related only to the section 1192.7 language. (See fn. 13, *ante.*) The jury made no finding of personal knife use by Holloran. It was not asked to make a finding under section 1192.7 or a finding under the enhancement provided in section 12022, subdivision (b)(1) for personal use of a knife.[15]

There is no basis for reversal regarding the trial court's denial of the section 995 motion.

---

[14] The prosecutor advanced a group assault theory to explain how the GBI allegation related to Dobbs could be found true as to Holloran. The jury was instructed on the group assault theory of personal infliction of GBI pursuant to CALCRIM No. 3160. That instruction read: "If you find any defendants guilty of the crime charged in Count Four, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury on JEFFREY DOBBS during the commission of that crime. [¶] If you conclude that more than one person assaulted JEFFREY DOBBS and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on JEFFREY DOBBS if the People have proved that: [¶] 1. Two or more people, acting at the same time, assaulted JEFFREY DOBBS and inflicted great bodily injury on him; [¶] 2. The defendant personally used physical force on JEFFREY DOBBS during the group assault; [¶] AND [¶] 3. The physical force that the defendant used on JEFFREY DOBBS was sufficient in combination with the force used by the others to cause JEFFREY DOBBS to suffer great bodily injury. [¶] The defendant must have applied substantial force to JEFFREY DOBBS. If that force could not have caused or contributed to the great bodily injury, then it was not substantial."

[15] Section 12022, subdivision (b)(1) provides: "Any person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

## B. Nelson's Statement to Holloran's Sister

Holloran contends that the trial court erred when it refused to redact his name before allowing the prosecutor to adduce testimony from Holloran's sister, Sarah Linggi, that Nelson told her he stabbed and beat someone at the park that day because that person was on top of Holloran. Holloran argues the statement that "someone was on top of Holloran" was not sufficiently reliable for admission under Evidence Code section 1230, the declaration against interest exception to the hearsay rule. He further contends that the *Aranda*/*Bruton*[16] rule required redaction of his name.

We conclude that admission of Nelson's entire statement did not violate *Aranda*/*Bruton*. We need not decide whether the statement was admissible as a declaration against interest because it was actually Holloran's attorney, not the prosecutor, who elicited the portion of the statement about which defendant complains. On cross-examination, counsel for Holloran elicited from Linggi the testimony that Nelson said he attacked the person in the park because that person was on top of Holloran. As for admission of the rest of the statement, any error was harmless.

### 1. Background

The prosecutor made an offer of proof in limine that Linggi would say Nelson phoned her to ask how Holloran was doing, and said he (Nelson) "stabbed [a] guy" at the park four times because the guy was on top of Holloran, and he (Nelson) grabbed a bat from Kent's truck and hit the guy in the head four times. In a voice mail message, which Linggi did not save, Nelson said he loved Holloran and would kill for "his brother."

---

[16] *People v. Aranda* (1965) 63 Cal.2d 518, 530 (*Aranda*), held that where an extrajudicial statement of one defendant implicates a codefendant, the trial court may permit a joint trial if the part of the statement implicating the codefendant can be and is deleted without prejudice to the declarant. *Bruton v. United States* (1968) 391 U.S. 123, 124-137 [20 L.Ed.2d 476] (*Bruton*), cited *Aranda* with approval and held a jury instruction to disregard reference to the codefendant would not suffice.

22

Nelson sought exclusion, implying the statement lacked any indicia of reliability, because the sister may have fabricated the statements to help Holloran.  Holloran asked the trial court to redact his name so the jury would hear only that Nelson said he stabbed the guy for being on top of "someone."  The prosecutor objected to the proposed redaction, arguing (1) Nelson's relationship with Holloran explained why Nelson would be making these statements to Holloran's sister, and (2) *Aranda/Bruton* redaction was unnecessary anyway because Nelson took the bulk of responsibility upon himself and did not try to shift blame to Holloran.

The trial court ruled Nelson's statement was admissible in its entirety against the other defendants as a declaration against interest.  The court reasoned that Nelson's statement to Linggi implicated Holloran by "plac[ing] defendant Holloran as involved in the fight," but Nelson's statement carried a particularized guarantee of trustworthiness because it was against his own penal interest and did not try to shift blame to his codefendants.  The court also ruled that Nelson's comments to Linggi were not testimonial and therefore presented no confrontation clause problem under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177].

Linggi did not testify as expected at trial.  She testified on direct examination by the prosecutor that Nelson did not say why he stabbed and hit somebody with a bat.  She also said he did not say how many times he stabbed someone.  She did say Nelson said he hit the person's head with the bat four or five times.

As for Nelson's assertion that he stabbed the person because that person was on top of Holloran, that testimony was not elicited by the prosecutor; it was deliberately elicited by Holloran's trial counsel on cross-examination.  Holloran fails to point out this

23

important procedural nuance in his appellate briefing, and the People have overlooked it.[17]  We discuss the import of this circumstance, *post*.

## 2. Analysis

### a. *Aranda/Bruton*

We look first to Holloran's constitutional claim because the harmless error analysis would require application of the *Chapman*[18] reasonable doubt standard if admitting the statement violated the Confrontation Clause.  (*People v. Garcia* (2008) 168 Cal.App.4th 261, 281 (*Garcia*).)  Holloran claims admission of the statement violated his right to confront the witnesses as set forth in *Aranda/Bruton*.  He is wrong.

---

[17]  Because defendant did not mention who elicited this testimony and the People overlooked it, we set forth the testimony here.

"[COUNSEL FOR HOLLORAN]:  [Y]ou indicated Mr. Nelson said he had stabbed someone that evening --

"[LINGGI]:  Yes.

"[COUNSEL FOR HOLLORAN]:  -- correct?  [¶]  And did he indicate to you that he had stabbed someone because someone was involved in some altercation with your brother, Joe Holloran?

"[LINGGI]:  All he basically said is that he would do anything for my brother and that he stabbed somebody and hit him in the head with a bat."

After counsel refreshed Linggi's recollection with a report containing her statement to a sheriff's investigator, the following took place:

"[COUNSEL FOR HOLLORAN]:  Does that refresh your recollection as to --

"[LINGGI]:  Yes, it does.

"[COUNSEL FOR HOLLORAN]:  And did he tell you that he had stabbed somebody because somebody was on top of his [*sic*] brother, and that's the reason he stabbed [him]?

"[LINGGI]:  Yes."

[18]  *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705] (*Chapman*).

24

Because *Bruton* is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements.[19] (*Arceo, supra*, 195 Cal.App.4th at p. 572.)[20] Defendant concedes the statement Nelson made to Linggi was nontestimonial, and we agree. Consequently, *Bruton* has no application here.[21]

### b. Declaration against interest

Evidence Code section 1230 creates a hearsay exception for statements against penal interest. Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his

---

[19] To the extent the *Aranda* rule would require the exclusion of evidence that need not be excluded under federal law, the *Aranda* rule is abrogated by Proposition 8 (Cal. Const., art. I, § 28, subd. (d)). (*People v. Arceo* (2011) 195 Cal.App.4th 556, 574-575 (*Arceo*).)

[20] Holloran cites *U.S. v. Mussare* (3d Cir. 2005) 405 F.3d 161, 168, for the proposition that *Bruton* applies to statements made by nontestifying codefendants to family or friends. In *U.S. v. Berrios* (3d Cir. 2012) 676 F.3d 118, 128, the Third Circuit disapproved of that holding in *Mussare*, as well as its earlier cases. (*Berrios, supra*, 676 F.3d at p. 128.) Consistent with *Arceo*, the *Berrios* court held that any protection provided by *Bruton* is only afforded to the same extent as the Confrontation Clause, which requires that the challenged statement qualify as testimonial. (*Berrios, supra*, at p. 128; see also *U.S. v. Shavers* (3d Cir. 2012) 693 F.3d 363, 395.)

[21] Even before the rule providing that the admission of nontestimonial statements of nontestifying codefendants does not violate *Bruton* crystallized, Nelson's statement would have been admissible in a joint trial because it was not powerfully incriminating of Holloran. (*Garcia, supra*, 168 Cal.App.4th at pp. 281-282 [declarant codefendant's statement that he and the defendant went looking for the guy the declarant codefendant had earlier fought was not powerfully incriminating because it facially incriminated the defendant only by showing that he and the declarant codefendant were looking for the victim; it was not direct evidence that the defendant intended the victim would be assaulted or murdered when they found him].)

25

position would not have made the statement unless he believed it to be true." Thus, to establish admissibility under this exception, the proponent has the burden of showing: (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest when made, and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Vasquez* (2012) 205 Cal.App.4th 609, 619-620 (*Vasquez*).) "We review a trial court's decision about whether a statement is admissible as a declaration against penal interests for abuse of discretion." (*Vasquez*, *supra*, 205 Cal.App.4th at p. 620.)

Holloran argues Nelson's statement was not against Nelson's interests, because it was designed to shift blame to the person on top of Holloran and make Nelson a hero in Linggi's eyes. Holloran further contends that Nelson's statement should have been excluded as insufficiently reliable, because no eyewitness testified about anyone using a baseball bat, and Dobbs was stabbed only once, not four times.

"Only statements that are specifically disserving to the hearsay declarant's penal interests are admissible as statements against penal interests." (*Vasquez*, *supra*, 205 Cal.App.4th at p. 621.) A statement is disserving of penal interest if it subjects the hearsay declarant to the risk of criminal liability to such an extent that a reasonable person in his position would not have made the statement unless he believed it to be true. (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.) We observe that the *Cervantes* court held the statement made in that case was specifically disserving, in part, because nothing about the statement suggested the declarant acted in self-defense. (*Cervantes*, *supra*, 118 Cal.App.4th at p. 175.) Here, arguably Nelson's statement amounts to a claim of defense of others, but that can only be said when the portion of the purported statement elicited by counsel for Holloran is factored into the analysis. As we have noted, on direct examination by the prosecutor, Linggi testified that Nelson did not say why he had stabbed anyone. And he said he hit someone on the head multiple times with a bat.

26

These statements, as related by Linggi during the direct examination of the prosecutor, were disserving of Nelson.

On the other hand, the trustworthiness of Nelson's statements was suspect. As Holloran notes, Dobbs was stabbed only once, not four times. Moreover, neither Dobbs nor any other witness said Dobbs or anybody else was struck with a bat. And nobody said they saw anybody on top of Holloran. Arguably, the exaggeration contained in Nelson's statement as conveyed by Linggi makes it untrustworthy for purposes of the declaration against interest exception. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 933 [unbelievable statements made declarant's statements untrustworthy].)

### c. Invited error/harmless error

Even assuming the entire statement was not admissible as a declaration against interest, which could be considered as evidence against Holloran, Strain, and Kent, we conclude any error was both invited and harmless.

The standard in *People v. Watson* (1956) 46 Cal.2d 818, 836–837 is applicable to state law error in the admission of hearsay. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.) Under *Watson*, the error is harmless unless it is reasonably probable that a result more favorable to the defendant would have been reached had the evidence not been introduced. (*Watson*, *supra*, 46 Cal.2d at p. 837.) We find that to be the case here.

Here, Holloran himself introduced the portion of the statement that is the focus of his argument on appeal. Holloran was not mentioned as being involved during the prosecution's direct examination of Linggi; thus, Linggi effectively redacted the statement by her purported lapse of memory. Any error related to the admission of Nelson's assertion that he stabbed someone because that person was on top of Holloran was invited by Holloran when his trial counsel elicited that testimony for apparent tactical reasons. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [doctrine of invited error barred defendant from challenging on appeal the trial court's admission of evidence,

27

where it was defense counsel who first elicited the evidence at trial]; *People v. Williams* (2009) 170 Cal.App.4th 587, 620 [same].)

Morever, any error in introducing the entirety of the statement was harmless. First, we note that no part of Nelson's statement accused Holloran of criminal conduct. Second, as we have noted, Nelson's assertions that he stabbed someone multiple times, hit someone with a bat multiple times and that the person he attacked was on top of Holloran were at odds with the testimony of all of the other witnesses, including Dobbs -- the person who was stabbed. As a result, the statement lacked credibility beyond the assertion that Nelson stabbed someone. Third, there was other evidence that established Holloran's guilt, which we discuss *post*.

Defendant Holloran complains that the prosecutor used Nelson's assertion in closing argument to argue "that Dickerson was on top of Holloran to show that Holloran was involved in the assault and not hit by a truck before Dickerson was kicked." But after the portion of Nelson's statement about which Holloran now complains was elicited by counsel for Holloran, it became fair game for argument by either side. Moreover, in making this argument, defendant would apparently have us ignore the context of the prosecutor's remarks. He fails to mention that the prosecutor's comments came in the prosecutor's rebuttal argument. The comments were made in response to argument by counsel for Holloran regarding what Holloran actually said during the conversation with Strain and Kent at the sheriff's station.[22] The prosecutor actually made no mention of

---

[22] As noted, the audibility of the recording was problematic. In addressing the prosecution's contention that Holloran admitted "kicking," Holloran's trial counsel asserted Holloran's use of the word "kicking" was not as the prosecution claimed. He argued that Holloran could be heard to say he was "under" Dobbs and Nelson was kicking Dickerson. Counsel told the jury, "If you listen carefully, . . . he precedes that statement by saying, I socked him. What he's talking about there is Mr. Dobbs, he says, precedes it by saying, I didn't even know nobody else. [¶] Reasonable interpretation of that, he didn't know what was going on regarding Mr. Dickerson,

28

any portion of Nelson's statement to Linggi in his opening closing argument to the Strain/Holloran/Kent jury.[23]

We conclude that it is not reasonably probable that Holloran would have received a more favorable result if Nelson's statement had not been admitted in their joint trial.

### C.  Holloran's *Miranda* Violation Contention

When he was interviewed at the hospital, Holloran claimed he went to the park alone, played basketball with people he did not know well, heard an altercation, and decided to walk home.  He got hit by a truck, apparently intentionally, and got a ride home from someone he knew as "Dom."  He said he was not involved in an altercation at the park.  Holloran said he had "associated with" the Norteño street gang in the past, was involved in a fight with some Sureños a couple of weeks earlier, and perhaps one of them was responsible.

Holloran contends the trial court erred in denying his motion to exclude this statement as he was not informed of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).  The trial court did not err.  Defendant's statement was noncustodial.

---

didn't know what was happening over in that area.  [¶] . . . [¶] . . . If he's using the word 'under' based on -- corroborated by Sarah [Linggi's] testimony, she said Mr. Nelson told her that he stabbed someone at the park, would have been Mr. Dobbs, and she specifically said the guy was on top of your brother, so I stabbed him, and I would put to you her testimony in that regard is credible."

[23]  Apparently misunderstanding that Holloran's counsel was arguing Holloran was "under" Dobbs and not Dickerson, the prosecutor argued in rebuttal, "Even if [counsel for Holloran] argues what was said is . . . I was under him and [Nelson] was kicking.  [¶] Ask yourself, how did he get under Mr. Dickerson if he wasn't involved in an assault.  [¶] There's no explanation for how he could have gotten under Mr. Dickerson.  He doesn't get hit by a car even if he lands in the area, even if he lands on top of Mr. Dickerson, until Mr. Dickerson's unconscious and bloody on the ground.  [¶]  So even if that's what he says, . . . there's no explanation for that, it means he was involved in the assault."

### 1. Background

At the hearing on the suppression motion, Deputy Christopher Baker testified he went to the hospital to check on the victims. Because he thought Holloran was just a victim, he took Holloran's statement without a *Miranda* advisement. Holloran was in a trauma emergency room at the hospital, unrestrained. No other law enforcement officers were in the room. When asked whether he "started questioning" Holloran without a *Miranda* warning, Deputy Baker said, "Not questioning him. I'm speaking to him in regards to what took place." The interview began at 8:47 p.m. and lasted no more than 15 minutes. Deputy Baker remained at the hospital in the vicinity of the victims waiting for an update on Holloran and Dickerson. At 11:30 p.m., a supervisor contacted Deputy Baker and told him Holloran was a suspect and to arrest him.

Another deputy's report indicated Holloran was identified as a "possible suspect" at 8:16 p.m. That deputy had been assigned to maintain the crime scene at the park and he had not been to Holloran's home or the hospital that night. Nor did he communicate with Deputy Baker, who was dispatched to the hospital.

Holloran's father testified he went to the hospital a few minutes after Holloran had been transported. When he arrived, he tried to see his son, but two deputies, one of whom was Deputy Baker, told him he could not see his son "right then." The father considered rushing past the deputies, but one said, "don't do it." One of the deputies said he had already talked to the son. The father testified he learned his son was being arrested around 10:15 p.m.

The trial court denied the suppression motion, stating: "The court does find credible evidence that *Miranda* does not apply to this interview. *Miranda* has two prongs: It requires custody, and it requires interrogation, and I do not find in this case that Mr. Holloran was in custody or detained, nor was he interrogated. [¶] He was being interviewed as a potential victim. He was not restrained in any way, and the court finds that *Miranda* does not apply."

30

The trial court admitted the evidence of defendant's statement at trial, admonishing the jury it could be used only against Holloran. The prosecution argued to the jury that Holloran's claim of self-defense at trial was undercut by his failure to assert it in his statement to the deputy at the hospital and that his false statement was evidence of Holloran's consciousness of guilt.

## 2. Analysis

*Miranda* applies only to custodial interrogations. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) In reviewing the trial court's determination that defendant was not in custody, we apply a deferential substantial evidence standard of review to the trial court's conclusions regarding the historical facts. (*Id*. at p. 402.) We independently review the mixed question of law and fact regarding whether a reasonable person would have felt free to terminate the interrogation. (*Ibid*.)

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404, fn. omitted.)

31

In order for *Miranda* to apply, the restraint must come from law enforcement. In *People v. Mosley* (1999) 73 Cal.App.4th 1081 (*Mosley*), the court held that the defendant was not in custody. There, a deputy questioned the defendant while the defendant was in an ambulance being treated by paramedics for a gunshot wound. (*Mosley*, *supra*, at pp. 1085-1086.) The *Mosley* court stated, "The record shows that defendant was in the custody and care of the paramedics who responded to a call for assistance. He was on a gurney and being treated by paramedics when [the deputy] entered the ambulance. [The deputy] did not intend to place defendant under arrest at that time. He simply wanted to find out what had happened at the scene of the shooting. He did not know how defendant was involved and whether defendant was a victim or not." (*Id*. at p. 1089.) "The question before this court is whether a person who is in the physical custody and care of medical personnel such as paramedics and who is being treated in an ambulance for a gunshot wound at the time of an interview with a police officer should be considered to also be 'in custody' for purposes of triggering the requirements of the *Miranda* decision." (*Mosley*, *supra*, 73 Cal.App.4th at p. 1089.) The *Mosley* court answered no. (*Id*. at pp. 1090-1091.)

The court in *Mosley* cited with approval a federal case holding that an interview in a hospital was not in a custodial setting within the meaning of *Miranda*, which concerns itself with an interrogation in a police-dominated atmosphere. (*Mosley, supra*, 73 Cal.App.4th at p. 1090, citing *United States v. Martin* (9th Cir. 1985) 781 F.2d 671, 673 [defendant was not in custody when questioned by police at hospital where no facts indicated law enforcement officers were involved in the defendant's hospitalization or did anything to extend his stay].) The *Mosley* court reasoned, "Any restraint of defendant's freedom of action was caused by the need to treat his gunshot wound, which was still bleeding and was actively being treated during the interview. He had not been placed under arrest because the police did not know what had happened that caused him to be shot. If he was a victim of a shooting they needed information to put

32

out a broadcast on his assailants. They knew that two shootings had occurred, but they did not know at the time of the interview what started the shooting, who was involved, or even if the two shootings were related to each other. Additionally, we note that the interview was in view of and in the presence of medical personnel who continued to treat defendant during the brief interview. We also note that the questioning was not accusatory or threatening, that defendant was not handcuffed, that no guns were drawn, and that defendant was about to be transported to a hospital and not to a police station or jail." (*Mosley*, *supra*, 73 Cal.App.4th at p. 1091.) A reasonable person in the defendant's position would not have believed he was in police custody, and so no *Miranda* advisement was required. (*Ibid*.)

Here, the totality of the circumstances establish that defendant Holloran was not in custody. The interview lasted no more than 15 minutes. Holloran was interviewed by a single deputy. There was no evidence of accusatory or threatening behavior by the deputy. The interview did not take place in a police-dominated atmosphere. It took place in the hospital, where Holloran had voluntarily sought treatment. Holloran was not cuffed or restrained. Any restraint on Holloran's freedom of action came not from law enforcement, but from physical injuries he sustained upon being hit by a truck, which apparently were not that bad since he was conversing with Kent and Strain at the sheriff's station hours later.

Additionally, at the time of the interview, the events at the park had only just occurred and were still being sorted out. Deputy Baker sought information to help find the perpetrator of the hit and run.

Holloran places great emphasis on the timing of when he became a suspect. Yet there was no evidence Holloran was told he was the focus of any investigation prior to or during the interview. In *Stansbury v. California* (1994) 511 U.S. 318 [128 L.Ed.2d 293] (*Stansbury*), the United States Supreme Court said, "We hold, not for the first time, that an officer's subjective and *undisclosed view* concerning whether the person being

33

interrogated is a suspect is irrelevant to the assessment whether the person is in custody." (*Stansbury*, *supra*, 511 U.S. at p. 319, italics added.)  An officer's subjective belief may become a factor in the custody analysis "only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." (*Id*. at p. 325.)

Citing *Stansbury*, Holloran argues that even if Deputy Baker did not know Holloran was a suspect, his subjective belief is irrelevant to the custody analysis. Holloran turns *Stansbury* on its head.  Baker's ignorance of Holloran's status as a potential suspect is relevant because if he did not know Holloran was a suspect, he could not have communicated that status to Holloran.

Defendant cites as analogous *Mincey v. Arizona* (1978) 437 U.S. 385, 399 [57 L.Ed.2d 290], in which the court reasoned the defendant in the hospital was at the complete mercy of the peace officer.  *Mincey* is inapposite.  In *Mincey*, the defendant was hospitalized after he was shot by narcotics officers who were executing a search warrant at his house.  During the raid, the defendant shot one of the officers in the exchange of gunfire. (*Mincey*, *supra*, 437 U.S. at pp. 387, 396.)  Police interviewed the defendant about the shooting while the defendant was in intensive care.  The defendant was told he was under arrest and given the *Miranda* warnings. (*Id*. at p. 396.)  The defendant repeatedly asked for a lawyer, but the officer persisted, only stopping for brief periods when the defendant was being treated or lost consciousness temporarily. (*Id*. at pp. 396, 401.)  The defendant's statements were used to impeach his trial testimony. (*Id*. at p. 397.)  The issue presented in *Mincey* was whether the defendant's statement was involuntary, not whether he was in custody for *Miranda* purposes (*id*. at pp. 398-402), and the facts in *Mincey* are nothing like the evidence here.  *Mincey* is of no help to Holloran.

Holloran points to his statement during the conversation with Strain and Kent at the sheriff's station that while at the hospital he asked to speak with his father, and the deputy said no. However, that deputies temporarily kept Holloran and his father apart at the hospital does not tip the scales in favor of custody. Holloran (and all defendants) were adults, ages 19 or 20. There is nothing wrong with police interviewing a witness alone. Though not part of the *Miranda* hearing, we observe that at trial the defense criticized a peace officer for interviewing a witness in the park in the presence of another witness.

We conclude there was no *Miranda* violation, because Holloran was not in custody. Having concluded Holloran was not in "custody," we need not address the People's argument that the questioning did not constitute "interrogation." (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 401 [police may question a suspect without *Miranda* advisement as long as person being spoken to is not in custody].) We also need not address the parties' arguments concerning prejudice.

### D. Substantial Evidence of Intent to Maim

Holloran and Strain contend there is insufficient evidence to support their conviction of aggravated mayhem (§ 205),[24] because there was insufficient evidence of intent to maim. They contend that, at most, the evidence supports only a conviction for simple mayhem. (§ 203.)[25] We disagree.

---

[24] Section 205 provides, "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole."

[25] Section 203 provides, "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or

35

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence-- evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054 (*Kraft*).)

Aggravated mayhem under section 205 is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury -- permanent disability or disfigurement. (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1162 (*Quintero*).) Specific intent to maim may not be inferred solely from evidence that the resulting injury disables or disfigures the victim. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835.) However, " 'specific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors.' " (*Quintero*, *supra*, 135 Cal.App.4th at p. 1162.) "[E]vidence of a

---

cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."

'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of such specific intent." (*Ibid.*; see *id.* at p. 1163 [evidence that defendant slashed victim's face many times with a knife supported aggravated mayhem conviction]; *People v. Park* (2003) 112 Cal.App.4th 61; *People v. Lee* (1990) 220 Cal.App.3d 320, 326.) If the evidence instead shows only an indiscriminate or random attack in an explosion of violence upon the victim, it is insufficient for a finding of aggravated mayhem. (*Lee, supra*, 220 Cal.App.3d at p. 326 [insufficient evidence of aggravated mayhem where defendant hit victim three times in the face with his fist and kicked him at least twice somewhere on his body].)

Strain argues the evidence here shows only an alcohol-induced frenzy of violence. Holloran says the evidence shows defendants either coming to the aid of a beleaguered friend (Kent) or exploding in violence.

The evidence showed a focused attack. Dickerson's coma and paralysis were caused by the stomping and kicking to his head. Although some witnesses described blows to Dickerson's head and "body," the medical evidence showed that *all* of the injuries were to Dickerson's head, except for a laceration to the wrist, which was consistent with a defensive wound incurred as the victim tried to fend off the blows to his head. Among the injuries to Dickerson's head were multiple facial fractures. Ravareau testified that Dickerson's face was so bloody that she could not see it.

The finding of specific intent here was bolstered by Kent's testimony that, as defendants went to leave the park, Nelson went back to Dickerson, who was already unconscious, and kicked him one last time. (See *Quintero*, *supra*, 135 Cal.App.4th at p. 1159 [after slashing victim's face with a knife, defendant said, " 'Fuck you, fool,' " and asked, " 'How do you like this?' "].)

That defendants had been drinking does not reduce their culpability from aggravated mayhem to mayhem. Voluntary intoxication may be a defense to a specific intent crime but only if the intoxication prevented the defendant from forming the

specific intent. (§ 22; *People v. Saille* (1991) 54 Cal.3d 1103, 1119.) Although there was evidence that defendants were drinking alcohol, defendants cite no evidence that alcohol consumption prevented any of them from forming the specific intent to maim.

Holloran argues there was no evidence he himself hit Dickerson in the head. Holloran argues that prosecution witnesses Ravareau and Dobbs said he was not one of the kickers or stompers, and Williams, retreating from her preliminary hearing testimony, said she was not sure if Holloran did anything to Dickerson. Holloran says since he did not engage in stomping, he did not commit aggravated mayhem.

Ravareau did testify that she did not see Holloran kicking or stomping Dickerson and Holloran was not standing in the immediate area of Dickerson at that time.

Dobbs testified that the person who was struck by the vehicle was not kicking or stomping Dickerson at the moment he was struck. But Dobbs also testified that after he was attacked, the people who attacked him headed toward the others who were attacking Dickerson. He estimated there were six to seven people kicking Dickerson. According to Dobbs, the truck drove "right into the crowd" that was kicking Dickerson and the person who was struck was about 10 feet away from Dickerson at the time.

Williams testified that after chasing her boyfriend, the person called Joe and the mixed-race male punched at one of the people who tried to help her, and when that person retreated, the two then joined three people who were kicking and stomping the person on the ground.

We also note that, although Freitag said she was not sure, she thought Holloran was one of the people she saw kicking Dickerson.

Additionally, there was evidence that Holloran was actually one of the kickers in the surreptitiously recorded conversation he had with Strain and Kent at the sheriff's station. Holloran said he was "kicking him." On appeal, Holloran says that, while these words appear on the transcript made available to the jurors during the playing of the video recording in the courtroom ("But I was like kicking him. Bang, bang, bang. And I

38

started walking up the alley (unintelligible), pow, get hit by the truck"), the words (particularly the word "I") cannot be discerned on the recording. We have reviewed the recording and conclude this was a matter for the jury to decide. And we note that Kent, in his trial testimony, agreed that Holloran said he kicked the victim. Kent -- a person who was presumably familiar with his friend Holloran's voice -- said that while he had no independent recollection of the conversation, he thought the transcript matched what he heard Holloran say in the recording played in court.

Looking at the evidence in the light most favorable to the judgment, there was substantial evidence Holloran was, in fact, one of the kickers.

Additionally, even if Holloran did not kick Dickerson, the evidence was sufficient to establish liability for aggravated mayhem as an aider and abettor. Holloran disagrees, contending there was no evidence he intended to promote or encourage a *maiming* injury. Holloran cites *People v. Beeman* (1984) 35 Cal.3d 547, for the proposition that one who just aids but does not abet is not guilty as an aider and abettor. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 412-413 ["aid" requires conduct; "abet" requires that the conduct be accompanied by the requisite criminal state of mind, i.e., knowledge of and intent to facilitate the perpetrator's unlawful purpose].)

However, the jury was instructed not only on aiding and abetting aggravated mayhem, but also on aggravated mayhem as the natural and probable consequence of an aided and abetted assault by means of force likely to produce GBI. Holloran concedes that based on Ravareau's testimony, there is substantial evidence Holloran punched Dickerson in the "upper body" just before the kicking and stomping. The prosecutor argued to the jury, "So if you decide Mr. Holloran committed an assault with force likely, okay, . . . never himself had the intent to disable or disfigure as required under aggravated mayhem, all he signed on for was this group assault, but . . . if anybody else involved in that group assault committed . . . an aggravated mayhem and th[at] crime[] [is a] natural and probable result[] of a group assault like this, then Mr. Holloran's guilty of . . . the

39

aggravated mayhem regardless of what was in his head. Okay. [¶] It's a question of whether . . . disability is a foreseeable consequence of a brutal group assault where a bunch of guys are kicking a defenseless man in the face and in the head."

Therefore, even assuming for the sake of argument the evidence was insufficient to support a finding that Holloran intended to aid and abet a maiming, there was ample evidence he intended to aid and abet assault by means of force likely to produce GBI, and maiming was a natural and probable consequence of the assault. On appeal, Holloran does not argue the evidence is insufficient to support conviction on this theory.

We conclude substantial evidence supports Strain's and Holloran's convictions for aggravated mayhem.

### E. Substantial Evidence -- Personal Infliction of GBI on Dobbs by Holloran

Holloran argues no substantial evidence supports the finding that he personally inflicted GBI (§ 12022.7, subd. (a)) in count four, assault with a deadly weapon on Dobbs, because it was Nelson who used the knife. We disagree, because the finding may be upheld on the basis that in the course of the group assault in which Holloran participated, Dobbs sustained a broken jaw and a concussion.

Count four of the pleading charged defendants with assault on Dobbs "with a deadly weapon, to wit, a knife, *and* by means of force likely to produce great bodily injury." (Italics added.)

However, the prosecutor apparently elected to submit only the deadly weapon theory to the jury. The jury instruction for count four instructed *only* on assault with a deadly weapon, and the verdict form referred *only* to assault with a deadly weapon.

The prosecutor argued to the Holloran/Kent/Strain jury: "Obviously, there's only one stabber in this case. Okay. It's almost certainly Mr. Nelson. So you are very likely not going to find any of these defendants guilty of Count Four as a perpetrator. Okay. . . . [Y]ou're going to have to follow the aiding and abetting instruction. . . . So you're going

40

to have to decide if these guys knew of a stabbing, okay; knew of the criminal intent and intended to aid and abet it. [¶] . . . [¶] The GBI allegation for Mr. Dobbs is a little different. . . . All you need to decide is, did a defendant personally inflict great bodily injury on Mr. Dobbs? Okay. [¶] Now, although this is the -- an assault with a knife, somebody broke his jaw, too." The prosecutor argued both Nelson and Holloran inflicted GBI on Dobbs. And the prosecutor advanced a group assault theory to explain how the GBI allegation related to Dobbs could be found true as to Holloran. (See fn. 14, *ante.*) The prosecutor also argued the broken jaw as a basis for count five.

In Holloran's motion for new trial, the trial court declined to set aside the GBI finding, noting the broken jaw constituted great bodily injury.

Holloran argues the GBI finding cannot properly be based on his breaking Dobbs's jaw, because the broken jaw qualified as an element of count five, battery with serious bodily injury, not as the injury appended to count four. But Holloran cites no authority precluding use of the broken jaw for both charges, as long as there is no double punishment. (§ 654.) Here, the court stayed Holloran's sentence on count five, so double punishment is not an issue. Nor does Holloran cite authority supporting his assertion that only an injury inflicted by a deadly weapon can be the section 12022.7 GBI when that enhancement is appended to a charge of assault with a deadly weapon.

Section 12022.7, subdivision (a) requires that the defendant "personally inflict[] great bodily injury . . . in the commission of *a* felony." (Italics added.) The continuum of time covered by the language "in the commission of" has been interpreted to include any time during the course of a "continuous transaction." (See *People v. Frausto* (2009) 180 Cal.App.4th 890, 902-903 [section 12022.53, subdivision (d) enhancement for shooting causing death or GBI to a murder victim also applied to two attempted murder charges for other victims who were not wounded, but were shot at immediately before and after the defendant shot at the murder victim].) As for the injury inflicted, the statutory language of section 12022.7, subdivision (a) does not link the injury to the

41

manner of committing the charged felony. Here, great bodily injury was inflicted -- a broken jaw -- during "the commission of a felony" for which Holloran was convicted as an aider and abettor. And Dobbs also sustained another injury that would qualify as GBI -- a concussion. The evidence was sufficient to support a true finding on the GBI enhancement against Holloran as a participant in a group assault during which Dobbs sustained a broken jaw and a concussion. (See *People v. Modiri* (2006) 39 Cal.4th 481, 495-497; *People v. Dunkerson* (2007) 155 Cal.App.4th 1413, 1418.)

Holloran argues that, even if the jurors could use either the stab wound or the broken jaw as the basis for the GBI finding against him, the jurors were not instructed that they had to agree which injury he personally inflicted. Holloran demands reversal for lack of a unanimity instruction. However, a unanimity instruction was unnecessary because, although the prosecutor mentioned to the jury that Williams at one point said Holloran also had a knife, the prosecutor essentially conceded it was Nelson who stabbed Dobbs. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [unanimity instruction not required if prosecutor makes election in closing argument].) The prosecutor argued, "there's only one stabber in this case. Okay. It's almost certainly Mr. Nelson. . . . [¶] . . . [¶] Now, although this is the -- an assault with a knife, somebody broke his jaw, too."

Holloran argues in his reply brief that the trial court negated any election in responding to the jury's question during deliberations asking, "On the issue of count four on Dobbs, does the great bodily injury include the stab wound[] (in regards to Holloran)." The court responded, "the determination of whether the stab wound constitutes great bodily injury is made by you the jury, after applying the facts, as you determine them, to the law. [¶] . . . It is for you, the jury, to decide if the stab wound constitutes great bodily injury." Holloran claims this answer led jurors to believe they could find Holloran personally inflicted GBI caused by the stabbing even if Nelson was the one who stabbed Dobbs. Holloran failed to object to the court's response, and therefore his objection is forfeited. (*People v. Christopher* (2006) 137 Cal.App.4th 418, 427.) Moreover, we

42

simply disagree that the court's response caused the jury to make a finding of GBI as to Holloran that was different from the theory advanced by the prosecutor.

We conclude substantial evidence supports the GBI finding against Holloran regarding Dobbs.

### F.  Jury Instructions -- Aiding and Abetting

Strain contends that the jury instructions stating an aider and abettor is "equally guilty" with the perpetrator misled the jury by effectively directing that aiders and abettors who are liable under the natural and probable consequences doctrine must necessarily be convicted of aggravated mayhem, the same offense as the perpetrators, rather than a lesser offense of simple mayhem.  Strain also complains the instruction on natural and probable consequences was misleading because it did not include simple mayhem as a nontarget offense alternative to aggravated mayhem.[26]

Kent also assigns error to the "equally guilty" language, despite the fact that the jury found him less guilty than Holloran and Strain, by finding him guilty of simple mayhem and the others guilty of aggravated mayhem.  Kent presents a theory that the "equally guilty" language led the jury to find him guilty of assault by means of force likely to produce GBI (count three), even though the jurors may have believed that Kent's only misconduct was in helping Nelson flee the scene, as argued by Kent's attorney in closing argument.  Kent says his conviction on count three must be reversed, which necessarily requires reversal of count two, mayhem, which was predicated on mayhem being a natural and probable consequence of assault by means of force likely to produce GBI.

---

[26]  Strain does not assert error related to the "equally guilty" language in CALCRIM former No. 400 as applied to a person who directly aids and abets the intended act as explained in CALCRIM former No. 401.  Thus, we do not address it here.

Because CALCRIM former No. 400 was generally accurate, we conclude defendants forfeited their claims concerning the "equally guilty" language by failing to request that the trial court modify the instruction. (*People v. Loza* (2012) 207 Cal.App.4th 332, 349-350 (*Loza*); *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 (*Canizalez*); *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*).) Further, the failure to state that defendants could also be guilty of the nontarget offense of simple mayhem based on the natural and probable consequences instruction given here "made the instruction, at most, incomplete in the context of this case, not incorrect." (*Canizalez*, *supra*, 197 Cal.App.4th at p. 849.) Therefore, defendants were required to request modification of the instruction to add simple mayhem as a natural and probable consequence of the target offense. (*Ibid.*)

In light of Kent's ineffective assistance of counsel claim and to forestall any such future claim by Strain, we address the merits of defendants' contentions on appeal. Strain's assertions are erroneously premised on a connection between the "equally guilty" language in the general aiding and abetting instruction, CALCRIM former No. 400, and the modified version of CALCRIM No. 402, which described natural and probable consequences liability. While lawyers and judges understand the natural and probable consequences doctrine to be a form of aiding and abetting liability, the natural and probable consequences instruction did not call that doctrine a form of aiding and abetting and the instruction was not expressly tied to "equally guilty" language in the general aiding and abetting instruction in CALCRIM former No. 400. Indeed, the natural and probable consequences instruction treated that doctrine as a separate theory of liability.

The trial court instructed the jury with CALCRIM former No. 400, which at the time stated:

"A person may be guilty of a crime in *two ways*: One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and

44

abetted a perpetrator, who directly committed the crime. A person is *equally guilty* of the crime whether he committed it personally or aided and abetted the perpetrator who committed it. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."[27] (Italics added.)

The court then instructed the jury on direct aiding and abetting (CALCRIM former No. 401)[28] and on the natural and probable consequences doctrine, using an apparently modified version of CALCRIM No. 402.

In instructing on the natural and probable consequences doctrine, the trial court told the jury: "The defendants are charged in Count 3 with assault by means of force likely to produce great bodily injury and in Counts One and Two with attempted murder and aggravated mayhem. [¶] *Under the natural and probable consequences theory*, you must first decide whether the defendant is guilty of assault by force likely to produce

---

[27] An April 2010 revision eliminated the word "equally," so the instruction now reads, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400 (2011) p. 167.)

[28] CALCRIM former No. 401 read in pertinent part: "To prove that the defendants are guilty of a crime *based on aiding and abetting that crime*, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendants knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendants intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendants' words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendants do not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendants were present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendants were aiders and abettors. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself, make him an aider and abettor. . . ." (Italics added; original italics omitted.)

45

great bodily injury.  If you find the defendant is guilty of this crime, you must then decide whether he is guilty of attempted murder or aggravated mayhem.  [¶]  Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.  [¶]  To prove that the defendant is guilty of attempted murder or aggravated mayhem *under the natural and probable consequences theory*, the People must prove that:  [¶]  1. The defendant is guilty of assault by means of force likely to produce great bodily injury;  [¶]  2. During the commission of assault by means of force likely to produce great bodily injury a coparticipant in that assault by means of force likely to produce great bodily injury committed the crime of attempted murder or aggravated mayhem; and  [¶]  3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder or aggravated mayhem was a natural and probable consequence of the commission of the assault by means of force likely to produce great bodily injury.  [¶]  A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.  [¶]  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. . . ."  (Italics omitted.)

We employ an independent standard of review to questions of whether jury instructions correctly state the law and whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Our high court in *People v. McCoy* (2001) 25 Cal.4th 1111, 1114, held an aider and abettor in a case of direct aiding and abetting could be found guilty of a *greater* offense than the direct perpetrator.  The reasoning in that case led the court in *Samaniego* to conclude an aider and abettor's guilt may be *less* than the perpetrator's, if the aider and abettor has a less culpable mental state.  (*Samaniego*, *supra*, 172 Cal.App.4th at pp. 1164-

46

1165.) The court in *Samaniego* said the "equally guilty" language in CALCRIM former No. 400 was "generally correct in all but the most exceptional circumstances" but should have been modified. (*Samaniego*, *supra*, at p. 1165.)

Strain relies on this court's decisions in *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*) and *People v. Hart* (2009) 176 Cal.App.4th 662 (*Hart*), disapproved on other grounds in *People v. Favor* (2012) 54 Cal.4th 868, 879, fn. 3 (*Favor*), asserting that both cases "make clear, it is incorrect to inform the jurors that an aider and abettor 'is equally guilty' with respect to the perpetrator" in a prosecution grounded on the natural and probable consequences doctrine. While the court discussed the natural and probable consequences doctrine in both *Woods* and *Hart*, neither case discussed the "equally guilty" language in CALCRIM former No. 400 as that language was not implicated in the issues presented in those cases. Thus, *Woods* and *Hart* do not support Strain's argument.

With the exception of *Canizalez*,[29] the cases in which courts have held the "equally guilty" language to be potentially erroneous have all involved prosecutions grounded on direct aiding and abetting, not cases involving the natural and probable

---

[29] The court in *Canizalez* held that the "equally guilty" language in CALCRIM former No. 400 is actually legally correct in the context of defendants culpable under the natural and probable consequences doctrine. The court reasoned, "Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime. It follows that the aider and abettor will always be 'equally guilty' with the direct perpetrator of an unintended crime that is the natural and probable consequence of the intended crime. [¶] Consequently, the statement in CALCRIM No. 400 that '[a] person is equally guilty of the crime [of which the perpetrator is guilty] whether he or she committed it personally or aided and abetted the perpetrator who committed it' (italics added), is a correct statement of the law when applied to natural and probable consequence aider and abettor culpability and was properly given in this case." (*Canizalez*, *supra*, 197 Cal.App.4th at p. 852.) By citing *Canizalez* in connection with defendants' forfeiture, we do not intend to signal agreement with this holding in *Canizalez*.

47

consequences doctrine.  (See *Loza*, *supra*, 207 Cal.App.4th 332; *People v. Nero* (2010) 181 Cal.App.4th 504 (*Nero*); *Samaniego*, *supra*, 172 Cal.App.4th 1148.)  In each case, the jury was instructed with the aiding and abetting general instruction, CALCRIM former No. 400 or former CALJIC No. 3.00, which once contained the "equally guilty" language, and CALCRIM former No. 401 or former CALJIC No. 3.01, the instructions defining direct aiding and abetting.  CALCRIM former No. 400 began, "A person may be guilty of a crime in *two ways*."  (Italics added.)  That instruction then went on to identify the two ways -- by personally committing the crime as a "perpetrator" and by aiding and abetting, and then indicated that both are "equally guilty."  CALCRIM former No. 401 began, "To prove that the defendant is guilty of a crime *based on aiding and abetting* that crime . . . ."  (Italics added.)  Thus, the definition of aiding and abetting in that instruction is directly linked to the statement in CALCRIM former No. 400, "A person is *equally guilty* of the crime whether he committed it personally *or aided and abetted* the perpetrator who committed it."  (Italics added.)

The natural and probable consequences instruction given, on the other hand, does not say that a person who may be culpable for the nontarget offense is an aider and abettor to that offense.  Instead, the version of CALCRIM No. 402 used here identifies the natural and probable consequences doctrine as a *third* theory, separate from direct perpetration and aiding and abetting.  As can be seen in the italicized language, *ante*, the first sentence in the second paragraph begins, "Under the natural and probable consequences theory . . . ."  The first sentence in the fourth paragraph begins, "To prove that the defendant is guilty of attempted murder or aggravated mayhem under the natural and probable consequences theory . . . ."  Notwithstanding its legal status as a form of aiding and abetting, the natural and probable consequences doctrine was explained to the jurors as a separate theory of legal liability.  Consequently, we conclude that it was unlikely the jury read the "equally guilty" language in CALCRIM former No. 400 to apply to the natural and probable consequences instruction.

48

Moreover, in his closing arguments, the prosecutor did not link the natural and probable consequences theory to aiding and abetting or the "equally guilty" language. Consistent with the instructions, the prosecutor argued natural and probable consequences as an entirely separate theory. He described "three different ways to get" to a guilty verdict. He discussed being an actual perpetrator, aiding and abetting, and natural and probable consequences. As for aiding and abetting, the prosecutor initially explained, "[defendant] has to know of the unlawful purpose of the perpetrator. He has to intend to aid, encourage or facilitate the crime. He has to by act or advice, actually aid, encourage or instigate the crime. Okay. So that's aider and abettor. [ ¶ ] Then there's natural and probable consequences. I'm not going to say anything about that right now because that is significantly more complex than either being a perpetrator or an aider and abettor. I'll get to that in just a second." Later, when the prosecutor discussed the natural and probable consequences theory, he argued that the jury should look at that theory if it determined a defendant "had no idea" the perpetrator intended to commit the target offense. In rebuttal, regarding Kent, the prosecutor told the jury, "But if you find that all he did was an assault, and somebody else intended to kill or intended to disable or disfigure, and he had no idea that Mr. Strain or Mr. Nelson or Mr. Holloran had that intent, he is still guilty *if* you find that an attempted murder or an intent [*sic*] or an aggravated mayhem is a natural and probable consequence." (Italics added.) Thus, the prosecutor in effect argued equal guilt with those who are guilty of the nontarget crime only *if* the nontarget crime is a natural and probable consequence of the target crime.

As for inclusion of simple mayhem in the natural and probable consequences instruction, Strain does not expressly assert that the trial court had a sua sponte duty to include it in the list of nontarget offenses, but his argument that failure to do so misled the jury sounds like a close cousin, especially given his reliance on *Woods* and *Hart*. In *Woods*, this court said, "in determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to

49

consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence. Otherwise, . . . the jury would be given an unwarranted, all-or-nothing choice for aider and abettor liability. [Citation.]" (*Woods*, *supra*, 8 Cal.App.4th at p. 1588.) The court concluded the evidence did not warrant sua sponte instruction in that case, but said, "If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability." (*Id.* at p. 1593.) In *Hart*, this court applied *Woods* to reverse an aider and abettor's conviction for attempted deliberate and premeditated murder as a natural and probable consequence of an attempted robbery. This court held that it was "necessary to instruct the jury that it may find less culpability in the aider and abettor under the natural and probable consequences doctrine." (*Hart*, *supra*, 176 Cal.App.4th at p. 673.)[30]

Here, even though the trial court should have added simple mayhem as a nontarget offense in the jury instructions on the natural and probable consequence theory, the error was harmless.

---

[30] Under the facts in *Hart*, this court held it was theoretically possible for the jury to conclude that the perpetrator premeditated the attempted murder but that such premeditation was not a natural and probable consequence of the attempted robbery. (*Hart*, *supra*, 176 Cal.App.4th at p. 672.) In *Favor*, our high court disapproved *Hart's* analysis to the extent it viewed attempted unpremeditated murder as a lesser offense of attempted premeditated murder. (*Favor*, *supra*, 54 Cal.4th at p. 879 & fn. 3.) We do not read *Favor* as abrogating *Woods* or *Hart* insofar as they hold the trial court has a sua sponte duty to instruct on the lesser included nontarget offenses.

Error regarding the "equally guilty" language is measured by the harmless-beyond-a-reasonable-doubt standard of *Chapman*. (*Nero*, *supra*, 181 Cal.App.4th at pp. 518-519; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1165.) As to the omission of simple mayhem from the natural and probable consequence instruction, this court has observed, "Error in instructing the jury concerning lesser forms of culpability is reversible unless it can be shown that the jury properly resolved the question under the instructions, as given. [Citation.]" (*Hart*, *supra*, 176 Cal.App.4th at p. 673.)

The error here was harmless. First, there was ample evidence –- including eyewitness testimony and Strain's video recorded stomping demonstration -- that established his guilt as a direct perpetrator of aggravated mayhem. Likewise, evidence we have already reviewed presents compelling evidence that Holloran was, in fact, one of the people who kicked or stomped Dickerson and a direct perpetrator of aggravated mayhem. Second, as we have already observed, we know for sure that the instructions did not mislead the jury. The jurors clearly understood they could find defendants guilty of a lesser offense, because they did so. They found Kent not guilty of aggravated mayhem but guilty of simple mayhem, while finding Holloran and Strain guilty of aggravated mayhem. We thus know the Strain/Holloran/Kent jury was not misled by the instructions.

Kent contends the "equally guilty" language misled the jury into finding him guilty of assault by means of force likely to produce GBI in count three, even though the jurors may have accepted his testimony that he was in the parking lot at the time Dickerson was kicked and his attorney's closing argument that Kent's only misconduct was as accessory after the fact, in helping Nelson, whom he saw kick Dickerson, flee the scene and avoid apprehension. Kent wants reversal of count three, which in his view necessarily requires reversal of the lesser offense in count two, simple mayhem, because mayhem, as the nontarget offense, could not be committed unless he committed the target offense of assault. However, it is inconceivable that the jury properly understood the law

51

when deciding count two, for which it did not find Kent "equally guilty," yet was misled when deciding count three. The "equally guilty" language is not an issue, unless the jury first finds that a defendant engages in conduct to make him guilty of some offense. At oral argument, counsel for Kent suggested that offense is accessory after the fact. But the argument that the jury thought Kent was culpable of accessory after the fact and convicted him of assault by means of force likely to produce GBI because of the "equally guilty" language is untenable. As the aiding and abetting instructions made clear, a defendant could be found guilty on an aiding and abetting theory only if, "*before or during*" the commission of the assault by means of force likely to produce GBI, he intended to aid and abet the perpetrator in committing that crime and his "words or conduct did in fact aid and abet the perpetrator's commission of [that] crime." (See fn. 28, *ante.*) These elements are predicates to what makes an aider and abettor equally guilty. If the jury believed Kent merely aided after the fact by driving the perpetrators away, the jury could not have found the requisite intent or conduct for liability as an aider and abettor of the assault. Kent offers no theory to explain how the equally guilty language could mislead the jury into ignoring these elements, and we can discern none.

As to count two, Kent argues the verdict "suggest[s] that [his] conviction in Count 2 of the lesser included offense of simple mayhem was *not* based on either direct liability and/or aiding and abetting liability because otherwise the jury would have returned a verdict of aggravated mayhem, as it did for codefendants Holloran and Strain. The verdict of simple mayhem in (count 2, lesser included offense) is consistent with a verdict based on the natural and probable consequences doctrine -- i.e., one based on [Kent's] conviction of the target offense in count 3 [assault by means of force likely to produce GBI] with a finding that a coparticipant committed aggravated mayhem (i.e., another offense committed at the same time, which was committed as a natural and probable consequence of the target offense). Accordingly, count 2 should be reversed because under the natural and probable consequences doctrine the jury could not have

52

returned a verdict on count 2 without first finding that [Kent] committed the target offense charged in count 3."

The argument ignores the simple explanation that the jurors were *not* misled by any ambiguity in the instructions and understood they could find Kent culpable of a lesser offense than other participants. The evidence established that after Kent summoned his companions, he threw a beer can that struck Dickerson in the head. Multiple witnesses said Kent kicked Dickerson while he was on the ground. The maiming injuries sustained by Dickerson were caused by kicking. Any error related to the "equally guilty" language concerning Kent is harmless.

We reject defense arguments that prejudice is shown by the length of deliberations (eight days) and the jurors' requests for a rereading of testimony, a legal definition of intent, etc. Those circumstances establish nothing. We reject Strain's argument that prejudice is shown by the prosecutor's closing argument to the jury, which Strain perceives as exploiting instructional error. As we have noted, it does not.

We conclude that the instructions were not misleading, the totality of the instructions properly supplied the jury with the applicable law, and any error related to the omission of simple mayhem as a nontarget offense in the natural and probable consequences instruction was harmless.

### G.  Jury Instructions -- Consciousness of Guilt

Strain complains the three "consciousness of guilt" instructions, which said certain conduct may show defendant was "aware of his guilt," invaded the jury's province and lowered the prosecutor's burden of proof, because one cannot be "aware of his guilt" unless he is in fact guilty. Assuming the issue is preserved for appeal, we reject the contention.

"On review, we examine the instructions as a whole, in light of the trial record, to determine whether it is reasonably likely the jury understood the *challenged*

instruction[s] in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt." (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30 (*Paysinger*).)

The jury received the following standard instructions:

CALCRIM No. 362: "If a defendant made a false or misleading statement relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. You may not consider the statement in deciding any other defendant's guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

CALCRIM No. 371: "If a defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] [Same language for creating false evidence and admonition to consider the evidence only against the defendant who engaged in the conduct.]"

CALCRIM No. 372: "If a defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that a defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled cannot prove guilt by itself."

The prosecutor argued consciousness of guilt to the jury in the following evidence: Defendants fled after dropping off Holloran at home; Kent yelled at Anderson to "stop snitching"; Holloran lied to the police in the hospital; and during the surreptitiously recorded conversation they talked about jumping bail, Holloran told Strain to say the blood on his pants came from Holloran, and Strain said nothing about falling on Dickerson.

Strain concedes case law defeats his argument that the current instructions' language -- "aware of his guilt" -- is more onerous for defendants than the previous language -- "consciousness of guilt." (*People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159 [etymological analysis by Fifth District concluded consciousness and awareness were synonymous].) Strain suggests that *Hernandez-Rios* was wrongly decided. He argues that in the context of a criminal prosecution, a person could have a vague generalized consciousness of guilt, akin to a guilty conscience, without having a specific awareness of guilt, whereas the latter term leaves no room for a "not guilty" verdict. We disagree.

This court rejected challenges to these instructions in *People v. McGowan* (2008) 160 Cal.App.4th 1099 (*McGowan*), and *Paysinger*, *supra*, 174 Cal.App.4th 26, though not on the specific ground presented here. In holding that CALCRIM No. 362 was not an improper pinpoint instruction, this court in *McGowan* said the minor differences in language between the current and former versions of the instruction did not undermine the Supreme Court's approval of the instruction. (*McGowan*, *supra*, 160 Cal.App.4th at pp. 1103-1104.) In *Paysinger*, this court held CALCRIM No. 372 does not presume a crime has been committed. (*Paysinger*, *supra*, 174 Cal.App.4th at pp. 30-32.)

We also reject Strain's contention that the instructions "amounted to mandatory presumptions or burden-shifting presumptions that [he] was guilty if his behavior was substantially consistent with what was described in those instructions." The instructions simply state that the identified behavior "may show" a defendant is aware of his guilt, but at the same time explain that it is up to the jury to decide the meaning and importance of such behavior. Thus, just like the CALJIC predecessors, the instructions "ma[k]e clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (*People v. Jackson* (1996) 13 Cal.4th 1164,

1224 (*Jackson*).) The instructions do not lessen the prosecution's burden of proof. (*People v. Benavides* (2005) 35 Cal.4th 69, 99-100.)

Indeed, the instructions favor defendant Strain by providing balance. "The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citation.]" (*Jackson, supra*, 13 Cal.4th at p. 1224.) Each instruction tells the jury it may consider the evidence *but* the evidence " 'cannot prove guilt by itself.' " (*McGowan*, *supra*, 160 Cal.App.4th at p. 1104, citing *People v. Kelly* (1992) 1 Cal.4th 495, 531-532 [noting the CALJIC predecessor language, " '*but it is not sufficient by itself to prove guilt*' "].)

We conclude there was no instructional error.

## H. Detective's Failure to Memorialize Witness Statement, the Prosecutor's Opening Statement, Evidence Code Section 356

Holloran contends his convictions must be reversed because, prior to the preliminary hearing, a sheriff's detective did not memorialize in a report a statement his sister told the detective that Holloran himself had purportedly made to her. Holloran asserts a violation of *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215] (*Brady*). He also contends that reversal is required, because the prosecutor purportedly falsely told the jury in opening statements that Holloran confessed to his sister. Holloran further asserts the trial court erred in ruling the statements he purportedly made to his sister could not be admitted without redaction.[31]

---

[31] Holloran's asserted *Brady* violation and complaint about the trial court's redaction ruling were not properly presented under separate headings, as required by California Rules of Court, rule 8.204(a)(1)(B), which requires that each brief must "[s]tate each point under a separate heading or subheading summarizing the point . . . ." We disregard the noncompliance (rule 8.204(e)(2)(C)) and address these contentions to forestall future meritless claims of ineffective assistance of counsel.

## 1. Background

During the preliminary hearing, a sheriff's detective testified that on May 30, 2006, he took a statement from Linggi concerning a statement Holloran made to her. But while he had written notes on the subject, he did not write a report on it until September 2007, while the preliminary hearing was pending.

Prior to trial, the prosecutor sought to admit evidence of the statement Holloran made to Linggi. In the prosecution's in limine briefing, the prosecutor stated that Linggi would testify that Holloran told her, "[Kent] started something with a park employee who asked him to leave the park. [Kent] punched the park employee and the employee punched [Kent] back. Defendant Holloran then ran up and punched the employee to 'try to break it up.' The employee then punched Defendant Holloran. A 'big altercation" followed. Defendant Holloran admitted being guilty of beating the guy up, but not stabbing him."

Holloran's trial counsel stated he had no objection to admission of the entire statement. Kent's trial counsel objected on *Aranda/Bruton* grounds, asserting that that the statement should not be admitted unless Kent's name was redacted. Holloran's trial counsel objected to redaction, asserting that the entire statement should be admitted under Evidence Code section 356.[32] The prosecution suggested the statement could be redacted by inserting the words "his friend" for Kent's name.

The trial court agreed with Kent and ruled that the prosecution would be required to redact the statement. The court ordered the prosecutor and counsel for Holloran and

---

[32] Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

Kent to "meet and confer to determine if they can agree on the nature and scope of the redaction. If they cannot, the parties are directed to bring this lack of agreement to the court's attention, and the court will settle the redaction." The record does not reflect that an agreement was reached by counsel or that the trial court was later asked to resolve the issue.

Opening statements were heard on April 23, 2009. During the prosecutor's opening statement, he told the jury, "You'll hear testimony from Sarah Holloran . . . . She'll tell you quite plainly that her brother, Joseph Holloran, admitted to her that he was guilty of beating the guy in the park up."

Holloran's trial counsel made no objection to the prosecutor's comment. During his opening statement, Holloran's counsel told the jury that Holloran saw Tweaker confronting Kent, brandishing a knife. Dickerson and Dobbs were nearby. Holloran thought Kent was being attacked by all three, so he ran down the hill and threw a punch at Dobbs.

During the trial, the prosecutor did not ask Linggi about Holloran's statement to her.

### 2. Analysis

#### a. Asserted *Brady* violation

Holloran now contends that disclosure of his own statement to his sister at the preliminary hearing was untimely and violated *Brady*. He contends that he was prejudiced because, had the disclosure been made earlier in the investigation before "the state invested sixteen months and a huge amount of work prosecuting [him]," the prosecutor may have been inclined to dismiss the charges against him or strike a bargain for a simple assault plea.

*Brady* held "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*,

58

*supra*, 373 U.S. at p. 87.) To establish a *Brady* violation, a defendant must show: (1) The evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282; *People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*).)

"Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.]" (*Salazar*, *supra*, 35 Cal.4th at p. 1043.) Evidence is material under *Brady* when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481]; *In re Sassounian* (1995) 9 Cal.4th 535, 543 (*Sassounian*).) "It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*Sassounian*, *supra*, 9 Cal.4th at p. 544.) "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agers* (1976) 472 U.S. 97, 109-110 [49 L.Ed.2d 342]; *People v. Hoyos* (2007) 41 Cal.4th 872, 922 (*Hoyos*); *Sassounian*, *supra*, 9 Cal.4th at pp. 544-545.) The defendant has the burden of showing materiality. (*Hoyos*, *supra*, 41 Cal.4th at p. 918.)

Defendant Kent's assertion that the prosecution would have dismissed the charges against him or bargained for a simple assault conviction based on statements Holloran purportedly made to his sister as reported to law enforcement by the sister is nothing more than unrealistic speculation and does not even come close to establishing a reasonable probability that the result would have been different had the statement been disclosed earlier. The contention is totally without merit.

59

### b. Opening statement

Holloran asserts the prosecutor "misrepresented the facts" (italics omitted) and acted as his "own unsworn witness," telling the jury Holloran "confessed to beating up a guy" when Holloran actually said he punched a guy who had punched Kent. The argument is forfeited by Holloran's failure to object at trial. (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*) [defendant may not complain on appeal about prosecutorial misconduct unless defendant made timely objection in the trial court or objection would have been futile].)

Assuming the argument is not forfeited, the prosecutor's statement was nonetheless harmless. The trial court instructed the jury at the beginning of the trial and again at the end of trial that the statements of counsel are not evidence. We presume that the jury followed this instruction. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) Holloran's own opening statement informed the jury that Holloran told his sister that he threw a single punch after the person he punched had punched Kent. The case was not submitted to the jury for deliberations until June 3, 2009, some 41 days after the opening statements. There were numerous requests for readback, which suggests jurors needed to have their recollection refreshed about the trial testimony -- information the jury actually could consider as evidence in the case. Moreover, the evidence at trial showed that Holloran did participate in a physical assault of Dobbs, who was punched and sustained a concussion and a broken jaw.

We see no reason to reverse based on the prosecutor's opening statement.

### c. Evidence Code section 356 contention

Since the prosecution never introduced evidence of Holloran's statement to his sister, we need not address his contention that the trial court erred when it ruled his statements to his sister could not be introduced by the prosecution unless the statement was redacted to exclude reference to Kent.

### *I.* Prosecutor's Closing Argument

Holloran, joined by Kent and Strain, argues the prosecutor misled the jury on reasonable doubt three times in his closing argument. Strain, joined by Kent, also argues trial counsel rendered ineffective assistance of counsel by failing to object in the trial court. We disagree.

All defendants forfeited these contentions. Not one of the defense attorneys objected to any of the prosecutor's comments. Had an admonition been necessary, it would have cured any harm. (*Hill*, *supra*, 17 Cal.4th at p. 820.)

Nevertheless, we will assume for the sake of argument that the contentions are preserved for appeal, and we therefore need not address ineffective assistance of counsel. We see no prosecutorial misconduct.

A prosecutor commits misconduct when he misrepresents the standard of proof or trivializes the quantum of evidence required to meet the standard of proof. (*Hill*, *supra*, 17 Cal.4th at pp. 831-832.) When a claim of prosecutorial misconduct focuses on the prosecutor's comments in closing argument to the jury, the question of prejudicial impact is whether there is a reasonable likelihood the jury construed or applied the remarks in an objectionable fashion. (*People v. Pierce* (2009) 172 Cal.App.4th 567, 572 (*Pierce*).)

#### 1. Abiding Conviction

The first contention is that the prosecutor encouraged the jurors to come up with their own definition of "abiding conviction," which could make defendant guilty if the jurors thought he was probably guilty.

The prosecutor told the jury:

"[T]he law defines reasonable doubt as proof that leaves you with an abiding conviction that the charge is true. Nobody is going to define abiding conviction for you any further than that. It's one of those lawyer phrases. You decide what it means. *What it really mean*[*s*] *is*, when you vote, when you come in here and the verdicts are read, are you convinced that they're right? Are you satisfied that I've done my job and proved to

61

you that each of these defendants is guilty?  And when you go to your 4th of July picnic here in a couple of weeks and you tell people finally about your jury duty and what it was about and what you heard, are you going to be satisfied with your verdict?  Are you going to be convinced it's right?"  (Italics added.)

Holloran says the prosecutor's comment was improper because "abiding conviction" has a meaning the jury is not entitled to ignore (*Hopt v. Utah* (1887) 120 U.S. 430, 439 [30 L.Ed. 708] (*Hopt*) ["settled and fixed"]; *People v. Brigham* (1979) 25 Cal.3d 283, 290 (*Brigham*) [lasting and permanent]), and the jurors may have come up with their own definition that abiding conviction meant defendant was guilty if they thought it probable that he was guilty.

While the prosecutor said the term "abiding conviction" would not be defined and "[y]ou decide what it means," we read that statement in connection with the instruction that "[w]ords and phrases not specifically defined . . . are to be applied using their ordinary, everyday meanings.  (CALCRIM No. 200.)  And we observe that after stating, "[y]ou decide what it means," the prosecutor immediately went on to discuss what abiding conviction "really mean[s]" and used the example of still being convinced when thinking about the case in a couple of weeks at a Fourth of July picnic.

The descriptions of "abiding" in *Hopt* and *Brigham* "are self-evident and an unnecessary elaboration of a readily understood term."  (*Pierce*, *supra*, 172 Cal.App.4th at p. 573; see *id.* at pp. 573-574 [no reasonable likelihood that jury was misled by prosecutor's remarks evoking permanence].)  The term has an ordinary, everyday meaning consistent with the prosecutor's comments, which evoked permanence.  There was no prosecutorial misconduct regarding abiding conviction.

### 2.  Puzzle Analogy

Holloran claims the prosecutor trivialized the quantum of proof by analogy to a puzzle.  The prosecutor said:

"You impartially compare and consider all the evidence.  Okay.  It's a big-picture look at things because you can dissect anything and say, well, this little piece here isn't enough.  This piece over here's not enough, but when you put it together and form the puzzle, you can tell what the big picture is. . . .  [¶] . . . [¶]  . . . Gary Larson of the Far Side has a cartoon that's applicable.  A couple of helicopter pilots are flying over an island where a stranded guy has written, 'Health,' and the pilot says, 'Wait, wait.  Cancel that.  I guess it says, "Health." '  Okay.  Ladies and gentlemen, if you get to, 'Health,' in this case, then the defendants are guilty.  You don't have to get all the way to[] 'Help.' "

Holloran contends this court condemned an identical analogy in *People v. Katzenberger* (2009) 178 Cal.App.4th 1260.  He is mistaken.  In *Katzenberger*, this court found nonprejudicial misconduct in a prosecutor's use of an eight-piece puzzle of the Statue of Liberty to argue it was possible to identify the image beyond a reasonable doubt even with two pieces missing.  (*Id*. at pp. 1264-1265, 1268-1269.)  This court held the use of an easily recognizable iconic image, along with the suggestion of a quantitative measure of reasonable doubt, conveyed an impression of a lesser standard of proof.  (*Id*. at p. 1268.)  Here, in contrast, there was no visual aid, no iconic image, and no suggestion of a quantitative measure.  *Katzenberger* does not help defendants.

**3.  Articulable Reasons to Doubt**

Holloran complains that the prosecutor misled jurors to believe "reasonable doubt" requires an ability to articulate reasons for the doubt.

The prosecutor argued to the jury:  "The terms reasonable doubt define themselves almost.  It's a doubt that's based in reason.  You should be back there using your head.  Okay.  You can't go with a gut feeling.  You can't go on emotion.  And so if you have what you think is a reasonable doubt and a juror says, 'Well, tell me about it.  What is your doubt based on?' you should be able to explain it.  You should be able to articulate it.  You should be able to have a rational discussion about it.  And if you can't do that, then all I'd ask you to do is stop and ask yourself, is it a reasonable doubt?  If I can't

63

explain it and I can't talk to my fellow jurors about it, is it reasonable, or is it something that's based on my gut?"

Holloran cites authority that it is not necessary for a juror, or a judge in a bench trial, to articulate reasons for reasonable doubt. Here, however, the prosecutor merely suggested that a juror unable to articulate reasons for doubt should reconsider whether the doubt was based on "gut" alone instead of reason. Thus, the cited cases are inapposite.

Holloran quotes from *People v. Engelman* (2002) 28 Cal.4th 436, in which our high court said, "It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so.." (*Id*. at p. 446.) *Engelman* held that a former standard instruction given just prior to deliberations, which obligated jurors to report fellow jurors who refused to deliberate or follow the law, was inadvisable, because it created an unnecessary risk of inducing jurors to expose the content of deliberations. (*Id*. at pp. 439, 446.) In context, the language Holloran quotes is part of the *Engelman* court's observation that a juror does not necessarily commit misconduct in deliberations by disagreeing without articulating the basis for disagreement.

Holloran cites *U.S. v. Chilingirian* (6th Cir. 2002) 280 F.3d 704, 711, as stating that even a judge in a bench trial may have trouble articulating the basis for his doubt, yet find the defendant not guilty. However, that comment was made in the context of holding that inconsistent verdicts, whether by judge or jury, are not subject to reversal merely because of inconsistency. (*Ibid*.) Thus, the appellate court would not require a judge to make findings explaining the inconsistency for appellate review.

Holloran notes a reasonable doubt may be based on a lack of evidence rather than a defect in the evidence (*Johnson v. Louisiana* (1972) 406 U.S. 356, 360 [32 L.Ed.2d 152]), which would be difficult to articulate. Nevertheless, Holloran fails to cite any authority refuting the prosecutor's point that reasonable doubt should not be based on "gut" alone.

64

There was no prosecutorial misconduct.

## J.  Public Trial

Holloran and Kent[33] argue the trial court denied their constitutional right to a public trial by banishing Holloran's father from the courthouse.  We disagree.

### 1.  Background

At the beginning of the trial, the trial court ordered all witnesses to be excluded from the courtroom until they had been released as witnesses.  Among the preinstructions the court gave to both juries was the following:  "During the trial, do not speak to any party, witness or lawyer involved in the trial."

Presentation of the evidence to both juries began on April 27, 2009.  On that day, while Holloran's father was still excluded from the courtroom awaiting his turn on the witness stand, the prosecutor reported he heard Holloran's father talking about the case on the phone in the court hallway within earshot of a juror from Nelson's jury.  The court questioned the juror, who said she did overhear the conversation but did not pay attention, as it was information the juror had heard in court.  The juror told the court she could remain fair and impartial.  The court handled the matter informally by having Holloran's counsel go out and talk to the father in the hallway about the rules.

After the father testified on May 4, 2009, the trial court allowed him to remain as a spectator.  On Thursday, May 14, 2009, a Nelson juror reported seeing another juror, Nelson Juror No. 10, speaking with defendant's father.  The trial court deferred the matter because Nelson's trial counsel was out sick.

On Monday, May 18, 2009, the court conducted a hearing on the matter.  The reporting juror said he first saw Juror No. 10 speak with the father at the elevators on

---

[33]  We note that Kent's claim is forfeited, because he failed to object on this ground in the trial court.  (*People v. Virgil* (2011) 51 Cal.4th 1210, 1237; *People v. Thompson* (1990) 50 Cal.3d 134, 157.)

the preceding Monday or Tuesday, which may have been a simple exchange of pleasantries, and then saw, but could not hear, Juror No. 10 and the father talking outside the courthouse, shortly after 9:00 a.m. on the preceding Thursday. As to the second occasion, the juror reported that as he was leaving the building after the jury was excused early, he saw the father and Juror No. 10 "engaged in a conversation" in "the patio area out in the front of the courthouse." The reporting juror went on to say, "[t]hey were standing, garbage can in between them, but -- kind of leaning against the wall, the garbage can between them just talking. [¶] And I looked for a second because now it's the second time that I saw them, and about five seconds later they just kind of both turned and walked away their separate ways." In response to the trial court's followup question about the length of the reporting juror's observation, he said, "I observed them maybe three to four seconds."

The court questioned Juror No. 10, who said he did not recall exchanging words with any witness or spectator and did not recall what Holloran's father looked like. He said he had no recollection of conversing with Mr. Holloran outside of the courthouse on the previous Thursday when the juries had been excused early. He also denied that any spectator tried to converse with him.

The court then questioned Holloran's father, who said he saw the juror leaving and asked the juror, "what's up?" The juror said that one of the attorneys called in sick, and no court today, and he was going to work. The court asked the father, "So you said, What's up?" The father modified his statement, and stated that might not have been what he said. He went on to explain that prior to the Thursday morning proceedings, Kent's father had come up to him and said there would be no court because counsel for Nelson was ill. ". . . I was going to come up and find out for certain. He said that there was going to be a jury instruction. . . . [¶] And I was finishing my cigarette, and the gentlemen walked out. I don't remember how the conversation started, but I asked him, No court today?" And he says, No, one of the attorneys is ill, and he was going to work.

66

And I said, I thought there was jury instruction, and he says the jury instruction was to be here Monday morning." This conversation took place, according to the father, "[o]ut front by the ashtrays." The father also said the juror works at a bakery and eats Doritos at the 3:00 p.m. break. The father knew this because when they were standing in the hallway one day, he said to the juror, "time for a snack, huh," and the juror said he needed a snack because he works at a bakery and is usually off work by 1:00 p.m. and home asleep by 2:00. The father said he "probably" also spoke to the juror near the elevator but did not remember what was said. The father said he "talk[s] to a lot of people," and "[i]f it was just in passing, I usually just make one comment and walk[] away from it." The father said he thought he was only prohibited from talking to jurors "about the trial." The court responded, "You can't be serious. You are not allowed to talk to any juror in any case or any witness. . . . [¶] And I am sure that [counsel for Holloran] told you that." The father responded, "Can't even say 'good morning,' " and the court replied, "You may not. You may not."

The court brought Juror No. 10 into the courtroom, showed him Holloran's father, and asked the juror if he had spoken with Mr. Holloran outside the courthouse by the trash cans on the patio area about court being cancelled. The juror said "No. When I left I walked across the street and exited." The juror said he did not recall any conversations with Holloran's father at any time during the course of the trial. The juror confirmed he worked at a bakery and got off at 1:00 p.m. and would eat a snack to stay attentive during the trial. But he did not recall sharing this information with Holloran's father. He said he might have told other jurors but would not have told anyone else.

After a chambers conference with counsel, the court stated that she "and all counsel share a concern about" the father's conversations. Consequently, the court questioned the other jurors for both juries, none of whom said they had any contact with witnesses or spectators, except one juror who yelled out his car window,

67

"court's cancelled" to a person walking on the sidewalk. The court admonished that juror not to talk to anybody involved with the case.

The trial court, with the agreement of Nelson's counsel,[34] then discharged Juror No. 10 from Nelson's jury and had Holloran's father return to the courtroom. The court told the father: "Mr. Holloran, you are a witness in this trial. You have testified before these juries, and you have had improper contact with one of the jurors. Based on that improper contact, we are being -- forced to be in a position where we are excusing that juror. [¶] And based on the fact that you are a witness and you have had improper contact, I am going to order that you may no longer attend the trial, and you may no longer be in and around the courthouse while this matter is still in trial." Holloran's father said: "Ma'am, at the beginning of this thing I was told not to talk to anybody about the trial. I wasn't told not to say hello. I wasn't told to be a complete jerk and ignore anybody. [¶] I am sorry. Have a good day."

Holloran's counsel said he understood the court's reasoning, but asked that the court not exclude Holloran's father because he was concerned that the jury might infer from the father's absence that he interfered with something related to the trial. The court replied, "He did. He's a witness, and he had contact with a juror." Counsel responded, "I'm not saying that's not true. I'm just -- balancing what was said, what happened, against the potential for prejudice to my client with his father now being excluded from the courtroom and the courthouse, I'm, for the record, objecting." The court told counsel that he could prepare an instruction that would tell the jury that "the fact that Mr. Holloran's father is no longer present, is not in any way to be construed against Mr. Holloran."

---

[34] Nelson's counsel said the juror's assertion that he did not remember any conversation with the father "stretches his credibility." The trial court said she shared counsel's concerns about the juror's veracity.

When the prosecutor brought up the earlier incident when Holloran's father was talking in the hallway, the court replied, "I think that was handled informally with [Holloran's counsel] going out and talking with Mr. Holloran in the hallway. [¶] Is that correct, [Holloran's counsel]? Holloran's counsel answered, "That's true, your Honor." Counsel never said he had limited his admonition to speaking about the case to jurors.

At the end of the day, the court admonished the jury, "Again, I want to stress to you how absolutely critical it is that you not have any contact or any conversation with anybody that is in any way associated with this trial: No witnesses, no attorneys, spectators. It is very, very important that you rigidly adhere to that admonition. [¶] I told you not to form or express any opinion or talk about this case among yourselves or with anyone else and not to have any contact with anyone even if it's unrelated to the case. You simply can't do it."

## 2. Analysis

A criminal defendant has a constitutional right to a public trial, including the presence of friends or relatives. (U.S. Const., 6th Amend., 14th Amend.; Cal. Const., art. I, § 13; *Presley v. Georgia* (2010) 558 U.S. 209, 210, 214-215 [175 L.Ed.2d 675] (*Presley*) [reversed judgment where trial court excluded the public from the courtroom during voir dire due to space limitations and concern that prospective jurors might overhear observers' remarks].)

However, the Sixth Amendment's presumption of openness can be rebutted by a showing that exclusion of the public was necessary and narrowly tailored to protect some "higher value." (*People v. Bui* (2010) 183 Cal.App.4th 675, 680-681 (*Bui*).) "[B]oth the defendant's and the public's right may be subjected to reasonable restrictions that are necessary or convenient to the orderly procedure of trial . . . ." (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552.) The right of the public to attend the trial may be curtailed under special circumstances without infringement on the constitutional right,

69

but it cannot be denied altogether, and it cannot be restricted except when necessary. (*People v. Byrnes* (1948) 84 Cal.App.2d 72, 73.) "The exclusion of any *nondisruptive* spectator from a criminal trial should never be undertaken without a full evaluation of the necessity for the exclusion and the alternatives that might be taken. This evaluation should be reflected in the record of the proceedings." (*Esquibel*, *supra*, 166 Cal.App.4th at p. 556, italics added.)

In *Esquibel*, the trial court excluded two friends of the defendant during the testimony of a single witness who was a minor because, although there was no indication of intimidation or harassment, the child's mother was concerned the spectators might be gang members and would recognize her child in the neighborhood. (*Esquibel*, *supra*, 166 Cal.App.4th at p. 554.) The appellate court held, ". . . the partial closure of a trial by the temporary exclusion of select supporters of the accused does not create an automatic violation of the constitutional right to a public trial." (*Ibid*.) On the facts, there was no violation. The exclusion was temporary; the defendant did not need the spectators for support; and family members remained in the courtroom. The court reasoned that the purposes of the public trial right would not be served by finding a constitutional violation. (*Ibid*.)

Here, the exclusion was for the rest of the trial and excluded a defendant's father but, unlike *Esquibel*, here the excluded spectator *was disruptive*, having twice forced the trial court to interrupt the trial in order to question jurors about his comments.

Holloran argues the trial court failed to consider lesser alternatives. However, the court gave the father a second chance after he inappropriately discussed the case over the phone within earshot of a juror. Yet the father persisted in inappropriate contact with jurors. Although he claimed he thought the prohibition against talking to jurors applied only to discussing the case, neither the father nor Holloran's counsel disputed the court's assertion that it was "sure" Holloran's counsel had informed the father that he was not allowed to talk to any juror. Indeed, Holloran's counsel expressly confirmed that he had

70

talked to the father, and he did not say he limited the admonition to not speaking about the case. And even after the judge reiterated the father could not talk to any juror or witness, the father persisted by asking if that included saying "good morning."

Ignoring the fact that counsel for Holloran never said he limited the admonition he gave the father to speaking about the case, appellate counsel argued at oral argument that trial counsel would merely have told Holloran's father what the court told the jury, which appellate counsel contends, was limited to an admonition not to talk to anyone about the case. Contrary to this assertion, in the instructions the court gave to the juries at the beginning of the trial, the trial court did give the standard admonition: "During the trial, do not speak to any party, *witness* or lawyer involved in the trial." (CALCRIM former No. 101, italics added.) The court did not limit this prohibition to speaking *about the case*. Thus, appellate counsel's theory that trial counsel would have told Holloran's father what the court told the jury does not support the argument that the father was only told that he could not talk to jurors about the case.

Holloran cites *People v. Chatman* (2006) 38 Cal.4th 344, which involved a defendant's claim of spectator misconduct. In *Chatman,* the defendant moved for a mistrial because the victim's mother had made several outbursts. The trial court denied the motion. (*Id.* at pp. 366-368.) The Supreme Court held the trial court did not abuse its discretion in denying the mistrial motion, and the defendant was not prejudiced. (*Chatman*, *supra*, 38 Cal.4th at pp. 368-369.) Holloran quotes from *Chatman*: "Surely, we would not say that the mother of either the victim or the accused should be excluded from the courtroom simply because she might act beyond the strictures of accepted legal deportment." Holloran reads too much into this quote, arguing "Just as Chatman's judge could not exclude the victim's mother," so too the judge here could not properly exclude Holloran's father for acting beyond the strictures of acceptable legal deportment. The "legal deportment" in *Chatman* did not involve talking to jurors outside of the courtroom. Moreover, our high court in *Chatman* did not hold the mother could not be excluded.

71

It merely held that the trial court did not abuse its discretion in denying defendant's mistrial motion grounded on a claim of prejudice resulting from the mother's decorum inside the courtroom during trial. (*Id*. at pp. 369-370.)

Holloran contends *Bui* supports his contention that exclusion of his father was unconstitutional. We disagree. *Bui* found no constitutional violation where a bailiff excluded three spectators, including two of defendant's family members, from the courtroom during voir dire, and the trial court allowed them to return when it learned of the matter 40 minutes later. (*Bui*, *supra*, 183 Cal.App.4th at pp. 679, 686.) The court in *Bui* held that *Presley* did not obviate consideration of the "de minimis" nature of a courtroom closure. (*Bui*, *supra*, 183 Cal.App.4th at p. 687.) Holloran extrapolates that, because his father's exclusion was not "de minimis," it violates the Sixth Amendment to the United States Constitution. *Bui* does not address a trial court's responsibility for dealing with disruptive spectators.

At oral argument, counsel for Holloran insisted that the trial court found the father's description of his encounters with Nelson Juror No. 10 to be credible. From this, and cases he cites where courts held juror conversations to be harmless, he argues that the father's contact with the juror was harmless and he should not have been excluded for such conduct. Our review of the record reflects no credibility finding regarding the father. Indeed, the father's description of the second encounter with Nelson Juror No. 10 is inconsistent with the observations of the reporting juror. As noted, the reporting juror saw the two of them conversing while "leaning up against the wall" with a "garbage can between them." In contrast, the father's rendition implied a conversation in passing as the juror was "leaving the building." Although the trial court made no express finding regarding the credibility of Holloran's father, given this discrepancy, the trial court would have been justified in doubting his veracity. In any event, we need not discuss the cases Holloran cites, in which the courts concluded

72

that contacts between witnesses and jurors were harmless. Those cases are inapposite here.

The exclusion of Holloran's father did not violate the right to a public trial.

### K.  Cumulative Trial Error

Strain contends the cumulative prejudice of errors warrants reversal of the judgment. Having reviewed all contentions, we disagree.

### L.  Restitution

Holloran, Kent, and Strain complain about the trial court's restitution orders. They argue the trial court erred in (1) ordering them to pay restitution to Dickerson's employer -- the Rancho Cordova Parks and Recreation District (the District); (2) setting the amount owed to Dickerson at $1,347,636.81 without a hearing; and (3) failing to show on the abstracts of judgment that the restitution to Dickerson is payable jointly and severally.[35]

#### 1.  Background

The trial court orally ordered Strain, Holloran and Kent to pay, $1,347,636.81 restitution to Dickerson, jointly and severally, "with an additional amount to be determined at a later date."

Additionally, the court ordered Strain, Holloran, and Kent to pay restitution to the District in an amount to be determined. The court further ordered Holloran to pay restitution to Dobbs, "jointly and severally with the other codefendants," in the amount of $8,720.

---

[35] The People note a typographical error in Holloran's and Kent's abstracts of judgment relating to the amount of restitution to be paid to Dickerson. Upon remand, the trial court will conform all abstracts of judgment to the correct amount.

Although the court orally ordered Holloran to pay restitution to the District, we note that order is not reflected in his abstracts of judgment.

The abstracts do not specifically state that payment is to be joint and several. Instead, the abstracts cross-reference recommended orders in the probation reports, with the following language: "FOR OTHER TERMS & CONDITIONS OF SENTENCE PLEASE REFER TO THE PROBATION REPORT FILED/ENDORSED 7/17/09 . . . ." The probation reports for each defendant indicate the restitution to Dickerson is to be paid jointly and severally. Holloran's probation report indicates that restitution to Dobbs is to be paid jointly and severally, but does not specify with whom he shares this obligation.

### 2. Analysis

#### a. Restitution for worker's compensation payments

During the sentencing hearing, the prosecutor told the court that counsel for the District was present in court and was requesting restitution for worker's compensation payments made by the District to Dickerson in an amount to be determined. The court made the order.

The People concede Dickerson's employer is not entitled to restitution. We agree with the concession. (*People v. Saint-Amans* (2005) 131 Cal.App.4th 1076, 1085.) We therefore vacate that order.

#### b. Hearing on amount of restitution to Dickerson and Dobbs

The order for Dickerson's restitution was based on the recommendation in the probation report, which simply stated, "As of May 6, 2008, Count 1 Victim's medical payments, expense payments, and indemnity payments have totaled $1,347,636.81." While a probation officer's recommendation based on a victim's statement of loss may constitute prima facie evidence of value (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1543), here it is not clear where the probation officer got this information.

The People point out that the trial court offered to hold a restitution hearing, but defendants never calendared a hearing. Nevertheless, say the People, they have "no objection to a remand for such a hearing," provided Kent waives his right to be present

74

"at this late date," just as Holloran and Strain in the trial court personally waived their right to be present.

Strain's attorney asked for all restitution to be determined at a later date by a hearing, and Strain expressly waived his right to be present at that hearing. Holloran's attorney objected to the lack of information as to the amount of restitution. He asked for documentation and said if he then wanted a hearing, he would ask for one. Holloran expressly waived his right to be present at the hearing. At Kent's sentencing, Kent's counsel objected he had no documentation of the $1.3 million restitution amount recommended by the probation department. The trial court said, "If the Defendant contests any of these restitution amounts, he is certainly entitled to a hearing." Kent did not request a hearing and did not waive his right to be present.[36]

In his reply brief, Kent does not say he wants to be present at the hearing. Nevertheless, "The defendant has the right to a hearing before a judge to dispute the determination of the amount of restitution . . . ." (§ 1202.4, subd. (f)(1).) A defendant has the right to be present at the restitution hearing unless he waives the right to be present. (§ 977, subd. (b)(1); *People v. Wilen* (2008) 165 Cal.App.4th 270, 286-287 [right to be present at sentencing]; *People v. Cain* (2000) 82 Cal.App.4th 81, 87 [restitution hearing is part of sentencing].)

Accordingly, we remand for a restitution hearing but deny the People's request that we condition the restitution hearing on Kent's absence.

As the court's original restitution order contemplated additional amounts were yet to be determined regarding restitution to Dickerson, it is clear the court retained jurisdiction to determine those additional amounts, and our remand order should not be read to limit the amount of restitution to the amount originally ordered. (§§ 1202.4,

---

[36] The record does not reveal whether documentation was ever provided to trial counsel or whether trial counsel decided to request a hearing or not.

75

subd. (f); 1202.46 [when the economic losses of a victim cannot be ascertained at the time of sentencing, the court shall retain jurisdiction over a person subject to a restitution order for purposes of imposing or modifying restitution until such time as the losses may be determined]; *People v. Bufford* (2007) 146 Cal.App.4th 966, 970 [court retained jurisdiction to hold restitution hearing and impose restitution even after defendant served her state prison sentence]; *People v. Harvest* (2000) 84 Cal.App.4th 641, 650 [victim restitution does not constitute punishment for double jeopardy purposes and there was no constitutional impediment to a restitution order made at resentencing after appeal].)

In the event the parties forgo a restitution hearing and accept restitution as originally ordered, the court is directed to correct the $100,000 discrepancy in Holloran's and Kent's abstracts, both of which show the amount of restitution for Dickerson as $1,247,636.81 instead of the $1,347,636.81 orally ordered by the court.

### c. Joint and several restitution

The People agree it is appropriate to amend the abstracts of judgment to show joint and several liability as to Strain, Holloran and Kent for the restitution to Dickerson. (*People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535.) We agree. Furthermore, we point out that cross-referencing the probation reports instead of setting forth a statement of joint and several liability in the abstracts is inappropriate. A probation report becomes confidential 60 days after sentencing and is not readily accessible to the public (§ 1203.05), while an abstract of judgment is a public document. Moreover, apparently none of the parties noticed the cross-references to orders in the probation reports, and we are concerned the California Department of Corrections and Rehabilitation might overlook those cross-references as well. We are also concerned that the probation reports might not be readily available to the California Department of Corrections and Rehabilitation personnel monitoring the payment of restitution in prison.

Thus, joint and several liability for victim restitution to Dickerson must be set forth in the abstracts regardless of whether the parties actually go forward with a

76

restitution hearing on remand. Accordingly, the court is directed to amend the abstracts of judgment to specify joint and several liability as to Strain, Holloran, Kent, and Nelson regarding the restitution to be paid Dickerson. The court must also amend the abstracts to delete restitution to the District.

We note a flaw in the trial court's oral order that Holloran pay restitution to Dobbs. The court ordered that Holloran pay restitution jointly and severally with the "other codefendants." The court's oral order was too broad. Only Holloran and Nelson were convicted of crimes related to Dobbs, and the court did not order the other defendants to pay restitution to Dobbs. The abstracts for Nelson and Holloran repeat this error by cross-referencing to the probation reports, which indicate that their restitution payment is joint and several, without specifying which defendant(s) share this obligation. The restitution order concerning Dobbs should be limited to defendants Holloran and Nelson, and their joint and several liability must be reflected in their abstracts.

## M. Conduct Credits

Kent's opening brief argues for additional presentence conduct credits under the January 25, 2010 amendments to section 4019, but his reply brief appropriately withdraws the contention.

## II. Nelson's Appeal

Nelson's separate appeal raises two contentions: Insufficient evidence of (1) intent to maim and (2) gang benefit.

## A. Substantial Evidence -- Intent to Maim

Nelson contends his conviction for aggravated mayhem must be reversed because there was insufficient evidence of intent to maim, as opposed to an indiscriminate attack. We incorporate by reference our discussion of this same issue in the appeals by Strain, Holloran, and Kent in part I.D. of the Discussion, *ante* (except for the discussion regarding the police station DVD, which Nelson's jury did not see), and conclude, as we did with those defendants, there was substantial evidence of intent to maim.

77

We additionally observe that, at the hearing on the motion for new trial, the trial court asked if defense counsel could point to any evidence contrary to the medical evidence that the injuries were almost exclusively to Dickerson's head. Defense counsel replied he would "just let the record speak for itself."

Nelson argues defendants' abandonment of the attack when they heard police sirens and Holloran got hit by the truck undermines any finding of specific intent to maim, because the end of the attack had nothing to do with intending to maim Dickerson while keeping him alive. We disagree. Indeed, the jury was free to credit Kent's testimony to the extent that Kent said Nelson went back and gave Dickerson a kick to the head before the group left the park.

Substantial evidence supports Nelson's aggravated mayhem conviction.

### B. Substantial Evidence -- Gang Enhancement

Nelson argues the section 186.22, subdivision (b)(1)[37] gang enhancements as to each count must be reversed because there was insufficient evidence the crimes were committed for the benefit of a gang or that Nelson specifically intended to promote, further, or assist in criminal conduct by gang members. We disagree.

### 1. Background

Sheriff's Detective Jason Ramos testified in front of both juries as an expert in Hispanic criminal street gangs, specifically the Norteños gang, which is predominantly Hispanic but includes Caucasians, African-Americans, and other ethnicities. The gang benefits by committing crimes against persons perceived to have disrespected the gang.

---

[37] Section 186.22, subdivision (b)(1) provides, "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, [receive a specified sentence enhancement]. . . ." Section 186.22, subdivision (b)(5) provides that when the underlying felony is punishable by life, the minimum parole eligibility is 15 years.

78

Respect is something of "tremendous importance" to gangs and is often "the precipitating factor for a violent assault or a confrontation." Even slight insults do not go unanswered, including a member of the public standing up to a gang member about the gang member's behavior. The gang's existence is predicated upon its members' ability to instill fear and intimidation among the community. The question "Where are you from?" is a way to identify potential rivals and is often a precursor to a violent confrontation. More often than not, invoking a gang name escalates a confrontation. It is not common for a non-gang member to represent gang membership by calling out the name of a gang during an altercation, because such a person risks confrontation by the real gang members.

East Side Piru is a Rancho Cordova gang consisting primarily of African-Americans who wear the color red and have a loose-knit affiliation with the Vario East Side Norteños, because the two gangs inhabit the same neighborhoods and need to coexist. Often Vario East Side graffiti is accompanied by East Side Piru graffiti and vice versa. On many occasions, members of both gangs are contacted by law enforcement in the company of one another. Ramos had previously seen a tattoo that equated East Side Piru with the Norteños. Ramos was aware that a known East Side Piru gang member and two known Norteño gang members had attended the preliminary hearing in this case.

The expert opined that Nelson is a Norteño member, based on his tattoos, correspondence, a MySpace page, and admissions to a peace officer. He also opined that based on letters and the MySpace page, Nelson is connected to East Side Piru. During Kent's cross-examination of the expert, Nelson's counsel stipulated that Nelson is a Norteño.

The expert opined Holloran is a Norteño based on his tattoo ("Rancho 916"), his father's statements about Holloran's gang affiliations, his association with Nelson, his

79

own admissions of Norteño association and conflicts with Sureños, his red boxer shorts, and gang-related statements attributed to him during the crime.[38]

The expert could not say that Strain and Kent were Norteño members.

The expert opined the charged crimes involving the victims, Dickerson and Dobbs, were committed for the benefit of and in association with the Norteños. To address argument made by appellate counsel for Nelson at oral argument, we set forth the gang benefit and association opinion testimony in detail.

Ramos testified that he became familiar with the facts of the case based on his review of police reports and talking to investigators involved in the case. After he testified on direct examination about the gang affiliations of defendants and various aspects of gang culture, the following took place.

"[PROSECUTOR]: . . . Based on your review of the crime reports in this case, what happened in Hagan Park on May 11th, 2006, do you have an opinion as to whether the assaults on Mr. Richard Dickerson and Mr. Jeffrey Dobbs were committed for the benefit of or in association with the Norteño criminal street gang?"

"[RAMOS]: Yes, sir.

"[PROSECUTOR]: What is your opinion on that topic?

"[RAMOS]: I believe that that was absolutely the case in this incident. I base that on a number of different factors, one of which is the fact that I believe two of the individuals involved in this incident were Norteño criminal street gang members at the time this incident took place. There are a number of different circumstances, including statements made in narrative reports of this case where words were yelled out directly prior to or during the commission of the assault on Mr. Dickerson that indicate

---

[38] Those statements were apparently the statements Williams had originally attributed to "Joe" when she spoke to the police, but later testified had been made by the mixed-race male with brownish-green eyes.

individuals' gang affiliation, including East Side Piru, Ranchos and Norteño. [¶] The circumstances being what they are in this case, I firmly believe that when an individual's involved in a fight or confrontation with somebody else and they yell a gang-related term, they are identifying themselves -- or themself [*sic*] as a member of that gang, and other individuals who join in upon hearing that are pretty much fighting for that cause. They want to represent that gang as well. They are not fighting due to any inherent rivalry or conflict with the victim themselves. [T]he assault is taking place in the name of that gang; in this case, in the name of East Side Piru, in the name of Vario East Side Norteños." [¶] There's nothing in the reports I've read to suggest that there's any other primary motive or reason for the attack that has anything to do with a previous disagreement, and the fact that multiple individuals assault another individual who is not a gang member and not an inherent rival seems to me to be very indicative and characteristic of many gang-related assaults that I've had occasion to either investigate or read about in reports."

No objection was made to how this opinion was expressed.

On cross-examination by counsel for Holloran and Nelson, Ramos testified he had no information about what witnesses had said during the trial or whether what they testified to was different from what they were reported to have said in the investigative reports.

Later, on redirect examination by the prosecutor, the following took place:

"[PROSECUTOR]: Let me give you this hypothetical: A number of guys are in a park in the afternoon hours, and they're walking around the park, and they are drinking, and they're confronting numerous groups of people. [¶] They confront one group with women and children and punch the only man who is involved. They confront another group, a couple who's walking along the riverbank by asking, "Where are you from?" saying, "This is the Piru," chasing them off, following them through the park, and when people come to the aid of the people that are being chased and say, 'We're calling the

police. We're park employees. Just get out of here. Leave the situation alone,' they start throwing beers, calling out Norteños, calling out Pirus, and a group assault takes place in which somebody is very, very, very badly injured. [¶] In your understanding of gang culture and gang lifestyle, is that a gang-related assault?

"[RAMOS]: Absolutely.

"[PROSECUTOR]: Several attorneys have asked you about your opinions based on police reports. [¶] Hypothetically, let's say that in the course of this trial and the preliminary hearing witnesses have testified that during the inciden[ts] in the park, Mr. Kent made statements about being a Norteño. Unknown people made statements about, 'It's a Rancho thing,' 'You fucked with the wrong people.' Mr. Kent also said something about, 'East Side Piru.' Mr. Holloran or Mr. Nelson asked the question, "Where are you from?" and told somebody in the park, 'This is Piru.' [¶] If those are the statements that were testified to under oath in a court of law, would that change your opinion that this was a gang-related attack in Hagan Park on May 11th, 2006?

"[RAMOS]: It would not change my opinion."

When on recross-examination by counsel for Strain, Ramos was asked to consider the earlier incidents in the prosecutor's hypothetical separately, he testified those incidents were "[n]ot necessarily" gang-related. Specifically, the following took place:

"[COUNSEL FOR STRAIN]: So, in your mind, can you divide into three separate activities?

"[RAMOS]: Sure.

"[COUNSEL FOR STRAIN]: Okay, Let's take the first one. A couple of young fellows are drunk, belligerent, out of control, and they get into some kind of a confrontation with a fellow. There are no gang words, gang signs, gang slogans. Nothing. Just a one-punch fight. [¶] Is that gang related?

"[RAMOS]: Not necessarily, no, sir.

82

"[COUNSEL FOR STRAIN]:  Okay.  Get off to the river.  Somebody's there.  People are spread out now.  They're not in a small group.  As a matter of fact, some are down at the river.  Some are up on the levee, roughly 40, 50 feet away.  [¶]  One person says something about -- one person says one word about a gang.  He says the word, "Piru."  You have no evidence of who hears that.  And ultimately a couple of people take off chasing another guy.  In that chase there are no gang words said.  There's no gang hand signs thrown.  There's no gang threats made.  There's no territorial statements made.  [¶]  Does that second incident where the chasing takes place -- would you say that's gang related?

"[RAMOS]:  Not necessarily, no, sir.

Notably, in the second hypothetical, counsel omitted facts supported by the evidence, including the question, "Where are you from?"  He also changed the reference to Piru from the prosecutor's hypothetical that somebody said, "This is the Piru" to somebody said "the word 'Piru.' "  Actually, Williams testified that after Thompson responded to the question about where he was from by saying he was from San Francisco, one of the group hunched his shoulders up and forward and said he was *from* "Piru."  At trial, she initially identified that person as the mixed-race person with brownish-green eyes, who was later identified as Nelson.  She then testified that the person who said he was from "Piru" may have been Holloran.

### 2.  Analysis

In addressing challenges to the sufficiency of the evidence supporting a gang enhancement, "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence--that is, evidence that is reasonable, credible, and of solid value--from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings,

83

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

Nelson points out that the Strain/Holloran/Kent jury found the gang enhancement not true as to those defendants. That Nelson's jury found the gang allegation to be true, while the other defendants' jury found the gang allegation not true, does not mean the evidence was insufficient. When there are dual juries, "[m]any reasons may explain apparently inconsistent verdicts: lenience, compromise, differing evidence as to different defendants, or, possibly, that two juries simply viewed similar evidence differently. If substantial evidence supports a jury verdict as to one defendant, that verdict may stand despite an apparently inconsistent verdict as to another defendant." (*People v. Palmer* (2001) 24 Cal.4th 856, 858.)

Nelson argues the only evidence supporting the gang enhancement against him is that he is a Norteño gang member and the expert's opinion. He cites authority that mere membership is not enough. However, there was more evidence from which Nelson's jury could infer the gang benefit and/or association elements of the gang enhancement, including: Dickerson and Dobbs unwittingly "disrespected" defendants by saying they were calling 911 and everyone should go their separate ways; Tweaker disrespected the group by pulling a knife on Kent and threatening to kill him; someone in Nelson's group called out the gang name during the attack on the victims, as well as using the gang name earlier; shortly after and/or during the time these things took place, Nelson injected himself in the incident involving Dobbs and Dickerson by attacking both of them; and both Nelson and Holloran were gang members who actively assisted each other during the incident and could rely on each other's cooperation. As for announcing the gang's name, despite Williams's earlier statement to the sheriff's deputies, the Nelson jury could have credited her trial testimony that the person who said he was from Piru during the

84

confrontation with her and Thompson was the mixed-race person with brownish-green eyes, which the evidence showed is Nelson. And even if the jury believed it was Holloran, not Nelson, who made that statement, the evidence shows that Nelson was nonetheless present and heard the gang's name invoked. As for Holloran and Nelson relying upon one another, we note here that Nelson told Holloran's sister he considered Holloran to be family and he (Nelson) would "kill" for Holloran.

The expert testified about the purposes of calling out the gang name during a physical assault. "[I]t lets the individual, or individuals, who you're in a confrontation with -- it lets them know that they're not just fighting you. They're fighting that particular gang or that particular group. [¶] And it's also -- if other members of that gang are present, it's in a sense -- it's a rallying cry. It's a call to arms, and that's a way of saying that this is now a gang thing, and if you want to be considered part of that, if you want to save face, if you ever want to consider yourself a part of that group in the future, . . . you need to step up and respond to it. . . ."

The expert also testified how a gang member's commission of a crime benefits the gang. "[P]art of a criminal street gang's ability to thrive and exist is predicated upon their ongoing pattern of criminal activity and their ability to instill fear and intimidation among the community . . . . If a gang is not able to do that, you know, they have the inability to really exist at the level that they need to."

"Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of' " the gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63.) And "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68.)

Nelson apparently misperceives our standard of review by highlighting evidence he thinks would support a "not true" finding of the gang enhancement, e.g., his group was drunk; he purportedly played "peacemaker" in the earlier incidents;[39] he himself purportedly did not utter any gang reference during the attacks on Dickerson and Dobbs; Hagan Park was not gang territory; Kent was frightened by the Tweaker's knife and the group responded to defend Kent. At oral argument, counsel for Nelson cited our high court's observation in *Albillar* that " 'it is conceivable that several gang members could commit a crime together, yet be on a frolic and detour unrelated to the gang.' " (*Albillar*, *supra*, 51 Cal.4th at p. 62, citing *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) From this, counsel argued that is consistent with what happened here -- Nelson's actions were unrelated to his gang. However, whether the evidence is consistent with an innocent theory is not the point on appeal. " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might

---

[39] This came from Kent, Strain, and Thompson. Kent testified that he heard and saw Holloran arguing with Thompson, Williams's boyfriend. Strain and Nelson ran up and Nelson got between them and told Thompson, "just go, just leave, just keep on walking." Strain testified that Anderson and Holloran were arguing with Thompson, and Nelson tried to calm everyone down, break it up and get Williams and Thompson to leave. We observe that because Kent and Strain were charged with a gang allegation, both had a motive to paint a picture without gang overtones. Thompson, who was called as a witness for the defense by Strain, testified that on the night of the incident, Thompson made it clear to the sheriff's deputy who interviewed him that he did not want to cooperate. When he testified, Thompson was in custody, because he was serving a prison sentence for second degree burglary. He had met Nelson in the holding tank in May of 2006 after the attacks at the park. At that time the two conversed and Thompson said he "squashed" whatever happened at the park. When Thompson testified about what happened at the park, he said Nelson asked him for a cigarette and the two of them had a friendly conversation. It was the others who started "talking trash" with him. One of the others took a swing at Thompson and another pulled a "pretty big" knife, so Thompson ran.

also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*Kraft, supra*, 23 Cal.4th at pp. 1053-1054.)

Moreover, Nelson's points are not as strong as he thinks. Although there was evidence of intoxication, Nelson cites no evidence that intoxication prevented any defendant from forming criminal intent.

As the prosecutor argued to the jury, "it doesn't matter [if Nelson was a peacemaker earlier], because once one of his friends gets involved in a confrontation, starts saying things about Norteños, Rancho, East Side Piru, Mr. Nelson has to get involved. He does not have a choice if he wants to continue to represent his tattoos, his colors, his gang. [¶] In the words of Aretha Franklin, R-E-S-P-E-C-T, that is what it is all about with these guys. That is their currency on the street."

That there is no evidence Nelson himself uttered gang words at the time Dickerson and Dobbs were assaulted is inconsequential. The gang enhancement statute (fn. 37, *ante*) requires only that the crime be committed for the benefit of or in association with the gang, and that defendant have the specific intent to promote, further, or assist any felony. While the evidence Nelson says is missing may have added to the proof establishing the enhancement, the statute does not require that a defendant personally announce his gang allegiance or the gang purpose at the time the felony is committed.

Nelson claims the expert conceded the "first minutes of the crimes were not gang related," and "acknowledged that the other defendants ran to Kent's aid when the Tweaker threatened Kent with a knife." However, the expert did not concede the response to Tweaker's threat was not gang related.[40] Indeed, as the expert noted, when

---

[40] Nelson distorts the expert's testimony here. Nelson cites the following:

"[COUNSEL FOR NELSON]: "[H]ave you read at all that . . . a person had come up with a knife and been in front of Mr. Kent?

a gang member is in a confrontation with someone and a gang affiliation is announced, the others who join in "are pretty much fighting for that cause. They want to represent that gang as well. . . . [T]he assault is taking place in the name of that gang[.] Loss of respect awaits a gang member who fails to join in under such circumstances.

At oral argument, counsel for Nelson contended there is no evidence Nelson heard gang-related words uttered before or during the incident. But, as we have seen, he was either present when those words were uttered during the confrontation with Thompson, or he uttered those words himself. As for the gang words stated during the assault on Dickerson and Dobbs, Dobbs was able to hear those words. He testified he heard gang-related words after Dickerson was hit with a beer thrown by Kent, and the evidence shows that Dickerson was hit with the beer after the group came down the hill in response to Kent's signal. Moreover, Nelson inserted himself into the mêlée around the time the words were uttered by assaulting both Dickerson and Dobbs. Again, in a substantial evidence analysis, we must presume every fact in support of the judgment the trier of fact could reasonably have deduced from the evidence (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60), and it is reasonable to infer from these circumstances that Nelson heard the name of the gang being invoked during the assaults.

---

"[RAMOS]: I believe I read that, yes, sir.

"[COUNSEL FOR NELSON]: Okay. And is it, to you, that if somebody is coming -- comes and sees an event where his friend has a knife to him and three people around him and those three people are bigger than this one person -- does it appear to you that someone would fight in that regard to defend their friend as opposed to there being some kind of gang involvement? Did you factor that in?

"[RAMOS]: It's certainly a possibility. If you're asking me whether or not it makes sense for individuals to defend a friend or acquaintance of theirs that has a knife to him, absolutely that could be the case, whether we are talking about gang members or not."

We further note, in addition to the "for the benefit of" theory of the gang enhancement, Nelson's jury could reasonably have found Nelson committed the charged crimes "in association with" at least one other Norteño, namely Holloran, notwithstanding the enhancement findings rendered by the Strain/Holloran/Kent jury. The expert opined that Holloran is a Norteño gang member, and the evidence was sufficient to establish that the two came together as gang members to attack Dickerson and Dobbs. (*Albillar*, *supra*, 51 Cal.4th at pp. 60-62.)

In his briefing, Nelson criticizes the expert for opining on an ultimate issue in the case -- whether the crimes were committed to benefit the Norteños. Nelson cites *People v. Ochoa* (2009) 179 Cal.App.4th 650, in which the court said, "Here, the prosecutor did not pose any hypothetical to the gang expert, but essentially asked him the impermissible question of whether the particular crimes were committed to benefit defendant's gang." (*Id.* at p. 664.)

On appeal, Nelson does not assert this as an assignment of evidentiary error. Such a claim would be forfeited because of his failure to object in the trial court. (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1208 (*Zepeda*) [defendant's objection to entire expert testimony was insufficient to preserve objection to expert opinion on the issue of the defendant's intent to benefit the gang].) Rather, Nelson expects us to disregard the expert's testimony as improper speculation. *People v. Ochoa* does not help Nelson on this point. The court reasoned that, given the lack of evidentiary support from which to draw inferences, the expert's opinion that the defendant's carjacking (which he committed by himself) benefited the gang was "based solely on speculation, not evidence." (*People v. Ochoa*, *supra*, 179 Cal.App.4th at p. 663.) The court further reasoned that evidence a gang member committed a crime alone combined with an expert witness's unsubstantiated opinion that the crime was committed for the benefit of the gang, was insufficient to find gang enhancement allegations true. (*Id.* at p. 665.)

In contrast, given the evidence in this case, the expert's opinion here can hardly be called "unsubstantiated" or "speculation" like the flawed opinion in *People v. Ochoa*.

At oral argument, citing *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), counsel for Nelson argued that the gang expert's opinion cannot be based on police reports and must be based on a hypothetical question including facts from the trial evidence. Counsel further argued that the expert opined that having viewed the police reports, he could not think of any other reason why the assault took place other than gang activity. Counsel asserts this is exactly what the court in *Vang* said is an inappropriate opinion.

As the testimony we have noted demonstrates, the expert's opinion was not based solely on a conclusion there was no other reason for the assaults other than a gang-related reason.

In any event, to the extent that the contention is that the expert's opinion was improper, that evidentiary contention is forfeited because there was no objection in the trial court on that ground. (*Zepeda*, *supra*, 87 Cal.App.4th at p. 1208.)

To the extent that counsel suggests the expert's opinion does not provide substantial evidence because it was not expressed in response to a hypothetical question, we disagree. First, we note that the court in *Vang* did not hold that all gang expert opinion testimony about gang benefit and/or association *must be* based on a hypothetical question. The court held that when hypothetical questions are asked, such questions must be based on the trial evidence and "[t]he questioner is not required to disguise the fact that the questions are based on that evidence." (*Vang*, *supra*, 52 Cal.4th at p. 1041.) The court did not consider whether an expert could express an opinion on gang benefit or gang association based on reports, when the expert references facts from the reports that are supported by evidence in the case, which is what happened here. Cases are not authority for propositions not therein decided (*People v. Barragan* (2004) 32 Cal.4th 236, 243), and we decline to expand *Vang* beyond the parameters intended by our high court. Second, the expert here was asked hypothetical questions by the prosecution on redirect

90

examination that included the facts he had relied upon, facts which were supported by the evidence the jury heard. And the expert was asked hypothetical questions by the defense. (See *Vang*, *supra*, 52 Cal.4th at pp. 1050-1051 [the parties may ask the expert various factual scenarios suggested by the evidence].) Additionally, the jury was properly instructed on how to evaluate expert testimony in general and expert testimony based on hypothetical questions. Finally, we note that the jury could have inferred gang benefit or association from the expert's testimony about gang culture and the evidence the jury heard, e.g., the question to Thompson, "Where are you from?" and the statement made by one of the defendants that he was from "Piru."[41]

We conclude substantial evidence supports the judgment against Nelson.

## DISPOSITION

As to the appeals of Holloran, Kent, and Strain, we vacate the restitution orders and remand for a restitution hearing concerning restitution to be paid to victim Dickerson. If a hearing is held, the court must amend the abstracts to show any amount of restitution it orders after the hearing. If no hearing is held, the court is directed to correct Kent's and Holloran's abstracts of judgment to reflect the total restitution the trial court ordered them to pay Dickerson -- $1,347,636.81. Regardless of whether a hearing is held, the court is directed to correct the abstracts of all four defendants to reflect joint and several payment of restitution by Strain, Holloran, Kent and Nelson for restitution to be paid to Dickerson, and joint and several liability by Holloran and Nelson for restitution to be paid to Dobbs. The court shall also correct the abstracts of judgment to delete the reference to restitution

---

[41] We also reject Nelson's argument that the expert testified the incident involving Thompson was not gang related. That is not what the expert said. Considering that incident separately, he said it was "not necessarily" gang related, and that was in response to a hypothetical question that omitted key facts, i.e., evidence that a person in Nelson's group asked Thompson where he was from and the fact that upon Thompson's reply that he was from San Francisco, the same person said he was from Piru.

to be paid to the Rancho Cordova Parks and Recreation District.  We otherwise affirm the judgments.

As to Nelson's appeal, we affirm the judgment.  Although not raised by Nelson on appeal, we direct the trial court to correct the abstracts of judgment to reflect the total restitution the trial court ordered him to pay Dickerson -- $1,347,636.81 -- and to note on the abstracts that it is to be paid jointly and severally with Strain, Holloran and Kent.  We also direct the trial court to correct Nelson's abstracts of judgment to reflect joint and several liability by Holloran and Nelson for restitution to be paid to Dobbs.  Further, the court is directed to delete from Nelson's abstracts the reference to restitution to be paid to the Rancho Cordova Parks and Recreation District.[42]

                                                                              MURRAY                 , J.

We concur:

               ROBIE              , Acting P. J.

               BUTZ               , J.

---

[42]  As Nelson has not asserted error regarding the restitution hearing, we assume he is satisfied with the proof, intended to waive the hearing, and is resigned to paying the originally stated amount.  Accordingly, we do not vacate the restitution order regarding Nelson. However, if the prosecution seeks additional restitution to be paid joint and severally by all defendants, then Nelson is entitled to challenge that additional amount.